[Civ. No. 25808. Second Dist., Div. Two. May 28, 1962.]

HUGH CRAFT, JR., et al., Plaintiffs and Respondents, v. JOHN W. BROOKS et al., Defendants and Appellants.

Don Edwin Raney and Joseph A. Ball for Defendants and Appellants.

Millikan & Montgomery and C. E. Millikan, Jr., for Plaintiffs and Respondents.

ASHBURN, J.—Defendants John W. Brooks and John C. Roger appeal from a judgment for $5,000, plus interest and costs, rendered against them upon the basis of a sale and assignment to plaintiffs, without a permit from the Commissioner of Corporations, of a half interest in an oil lease upon 46 acres of land near Firebaugh, in Fresno County, California. The question on appeal is whether the court properly held this transaction to be a sale of "a security" within the Corporate Securities Law, which defines "security" as including "any certificate of interest in an oil, gas, or mining title or lease" (Corp. Code, § 25008).

The objective of the statute is shown in *People* v. *Syde,* 37 Cal.2d 765, 768 [235 P.2d 601]: "[T]he general purpose of the law is to protect the public against the imposition of unsubstantial, unlawful and fraudulent stock and investment schemes and the securities based thereon."

The statute "aims 'to regulate and control the class and character of securities and investments that might be offered to the public.' " (*Domestic & Foreign Petr. Co., Ltd.* v. *Long,* 4 Cal.2d 547, 558 [51 P.2d 73].) That speculations in oil ventures fall within that category is not subject to debate. "In its [the statute's] application to matters beyond the scope of ordinary corporate financing through sale of stock or bonds, its greatest impact, by far, has been in the field of ordinary oil and gas transactions. The reason for that is probably to be found in the highly speculative nature of the business of exploring for oil and gas and the fact that California is an important oil and gas producing state." (5 U.C.L.A. L. Rev. p. 409.) "Variously known as corporate securities laws, securities acts, or blue sky laws, their primary purpose is to protect the unwitting investor against his own

folly in purchasing securities which are unsound or speculative in nature." (*Id.*, p. 491.) "[O]il and gas transactions bearing little resemblence to what is normally thought of as corporate activity, are covered by specific language in most of the statutes. This apparently is due to the belief of the legislatures that oil and gas and the various interests created therein are peculiarly susceptible to speculative buying and selling." (*Id.*, p. 492.)

Concerning the true extent of the term "security" as used in the act, the court said in *People* v. *Syde, supra,* 37 Cal.2d 765, 768: "The Corporate Securities Law does not contain an all-inclusive formula by which to test the facts in every case. And the courts have refrained from attempting to formulate such a test. ██ Whether a particular instrument is to be considered a security within the meaning of the statute is a question to be determined in each case." The courts have held that not all deeds to proven or prospective oil land are securities and that, looking through form to substance, the test is whether the buyer receives "a right to share in the profits or proceeds of a business enterprise to be conducted by others" or whether the buyer expects "to reap a profit from [his] own services or other active participation in a business venture." (*People* v. *Syde, supra,* 37 Cal.2d 765, 768.)

*Austin* v. *Hallmark Oil Co.,* 21 Cal.2d 718, 727 [134 P.2d 777]: "If the transaction is one in which the assignee is merely an investor who for a consideration is given the right to share in the profits or proceeds of an enterprise to be conducted by others, the instrument representing such interest is a security. Where, however, as in the present case, the assignee is to share in the conduct of the enterprise, the instrument representing an assignment of a fractional interest in the production of oil is not a security within the act."

*People* v. *Rankin,* 160 Cal.App.2d 93, 97 [325 P.2d 10], phrases the rule as follows: "It is settled law that any deed, certificate of interest or like instrument of conveyance or assignment falls within the act only when it appears directly or inferentially that the buyer contemplates receipt of profits from activities of other persons, such as carrying on a business, drilling an oil well, or sinking and operating a mine; the mere conveyance to him of a fractional interest in a piece of land or other type of property is not subject to the statute if the buyer must look only to the thing bought or his own

efforts to produce a profit to himself.'' This phrase, ''if the buyer must look only to the thing bought,'' though appropriate and adequate to the solution of the question there considered, does when applied to the instant case present a real problem.

The facts are these : Defendant Brooks, an attorney whose practice consisted mainly of matters concerning oil properties and oil leases, had obtained from Arvin Miller, a ''lease hound,'' the assignment of an oil lease from one Biancucci to Miller, which reserved an owner's royalty of 12½ per cent and an overriding royalty to Miller of 4 1/6 per cent. It conveyed 206 acres and 160 acres thereof were assigned to Highland Oil Corporation which had been organized by Brooks and Roger for the purpose of drilling a wildcat well; the lease permitted severance and the other 46-acre parcel was assigned to Brooks who held it for the benefit of Roger and himself. Highland Oil Corporation was sufficiently financed to put down a well and did drill a dry hole about a mile from the 46-acre parcel (a fact which was never disclosed to plaintiff Craft or to plaintiff Carolyn C. McMaster or her husband and agent, Fred A. McMaster). Highland started another well offsetting the 46 acres. The sale of the half interest in that lease was made to plaintiffs on April 7, 1955. Mr. McMaster had lost a substantial amount of money in a dry hole drilled near Bakersfield some months before April 1955. Roger was the drilling contractor on that job and told McMaster that when he found something good he would let McMaster in on it. So Roger approached him on this deal and recommended that he buy a half interest in the 46-acre lease for $5,000. McMaster testified that he relied wholly upon Roger, informed him that he knew nothing about oil leases, and that he relied upon him 100 per cent.

The value of the 46 acres lay in the fact that an offset well was being drilled or about to be drilled by Highland Oil Corporation on its adjoining parcel. That well technically was started on February 28, 1955, with a light drilling rig; after two or three days it was shut down and work not resumed until April 10th, after the deal was made with McMaster who represented both his wife and Mr. Craft in the transaction; neither of them had any talk with either of the defendants about it. Brooks and Roger had purchased this lease as a speculation, not expecting to drill but to sell or sublet. McMaster had no money to sink a well and no expectation of doing so; those facts were known to defendants. McMaster

and his principals also bought as a speculation. He said in his testimony, "I purchased no real property. . . . I was not negotiating to purchase any property. An interest in a lease is not the purchase of property." Roger told him it was an excellent opportunity as a well was being drilled by Highland Oil on an adjoining parcel and both defendants said that if the oil drilling was successful the lease would be worth more money; that if the well came in "we" could sell at a substantial profit; but they made no guaranty of any return from the investment. Brooks testified that he told McMaster that there always was a risk in drilling any wildcat well, and "it was our desire to hedge our investment" by selling a half interest. Roger testified that he told McMaster that if Highland got production the "property would become of great value"; also that "it would be as good a speculation as you could get in the oil fields." McMaster testified: "Q. Mr. McMaster, at no time prior to the execution of the assignment of April 7, 1955, did you believe that you were to participate with Highland Oil in any venture, isn't that true? A. I was not to participate with Highland Oil. Q. And what you bargained for on behalf of your wife, as you have described it, and Mr. Craft, was an interest in an oil lease, isn't that correct? A. I did not bargain for it. Q. You bought it? A. They bought it."

So far as appears defendants had full control of Highland Oil Corporation. Three days after the sale of the lease interest to plaintiffs through Mr. McMaster, drilling with a heavy rig started, it worked for 12 days, then the well was shut down and abandoned as a dry hole. Highland Oil Corporation had not made any agreement with plaintiffs to sink a well. Rescission and the instant action followed in due course.

It is clear that plaintiffs were not buying into Highland's drilling venture and only in a sense did they "look only to the thing bought" for returns on their investment, for without Highland's drilling on its own adjoining land there was no reason to expect any profit. But plaintiffs did contemplate "receipt of profits from activities of other persons, such as . . . drilling an oil well" (in the language of *People* v. *Rankin, supra*, 160 Cal.App.2d 93, at p. 97).

The adjudged cases have given the phrase "from activities of other persons" a broad meaning and application extending to situations in which the buyer of the oil interest expected to reap his reward through participating in the excite-

ment arising from bringing in a wildcat well upon property in the general area, especially upon an adjacent parcel. Such cases are *People* v. *Daniels*, 25 Cal.App.2d 64, 69 [76 P.2d 556]; *Moore* v. *Stella*, 52 Cal.App.2d 766, 774-775 [127 P.2d 300]; *People* v. *Chait*, 69 Cal.App.2d 503, 520 [159 P.2d 445]; *Ogier* v. *Pacific Oil & Gas etc. Corp.*, 132 Cal.App.2d 496, 501-504 [282 P.2d 574]; *Oil Lease Service, Inc.* v. *Stephenson*, 162 Cal.App.2d 100, 109 [327 P.2d 628]. *Moore* v. *Stella*, *supra*, says at page 771: "The question before the trial court, which is determinative of the question of legality, was . . . whether investors were led to part with their money upon the promise and in the expectation that they would be able at some future time to lease their interests to some oil company upon a royalty basis and whether this inducement, though not expressed in writing, was the sum and substance of the entire scheme of investment. If the correct answer to this question is in the affirmative, then the deeds partook of the very essence of those types of investment contracts which throughout the history of legislation on the subject in this state have been deemed to be proper subjects for regulatory supervision." At page 777: "If we were to hold otherwise the bars would be thrown down for promoters of oil ventures to go to the public with deeds to mineral rights instead of corporate stock, withholding the actual giving of oil leases until the land had been unloaded or perhaps not leasing the land at all, and the law as to such operations would be completely nullified. The Legislature has not either intentionally or inadvertently allowed a means of escape from regulation through such devices."

The case of *People* v. *Jackson*, 24 Cal.App.2d 182, 193 [74 P.2d 1085], applies the same line of reasoning to deeds conveying to residents of San Diego small fractional interests in Oklahoma and Texas lands, which deeds gave the grantee " 'right of ingress and egress at all times for the purpose of mining, drilling, exploring, operating and developing said lands for oil, gas, and other minerals.' " The court said: "Bearing in mind, however, that all the grantees named in such deeds were residents of San Diego County, whereas the lands were located in Oklahoma and Texas, and observing also the very small fractional interests conveyed, we have no hesitancy in declaring that the quoted language consists of empty words and that it was never anticipated that the grantees would ever avail themselves of the right so generously accorded to them."

In a "comment" upon "*The Applicability of the California Corporate Securities Law to Transactions in Oil and Gas*" appearing in 5 U.C.L.A. Law Review (*supra*), at page 491 et seq., the author expresses the following conclusion (p. 497): "In analyzing the particular interest to determine whether it falls within the definition of a security, the test to be used is not whether the *assignor* is to have control over operations, despite dicta to this effect in many cases. The interest is a security so long as the *assignee* is *not* to control operations, regardless of whether the assignor or some presently unidentified stranger to the transaction is to conduct operations."

 A public offering is not of the essence of a prohibited sale of a security (*Domestic & Foreign Petr. Co., Ltd.* v. *Long*, *supra*, 4 Cal.2d 547, 557), and, "[a] single transaction, if it meets the definition of the statute, is sufficient to come within the purview of the act." (*Cecil B. De Mille Productions* v. *Woolery* (9 Cir. 1932) 61 F.2d 45, 50.)

 Certainly this "opportunity" was the type of offering which the Legislature intended to be approved and authorized by the Commissioner of Corporations or not sold at all. We conclude that the assignment to plaintiffs of the half interest in the oil lease on the 46 acres was the sale of a security within the meaning of the act and voidable because it was not authorized by a permit from the Commissioner of Corporations.

It is unnecessary to discuss respondents' claim that the sale was made through concealment of a material fact or facts. What we have just said is sufficient to dispose of the case for it rests upon a finding of an unlawful sale of a security.

Judgment affirmed.

Fox, P. J., and Herndon, J., concurred.

A petition for a rehearing was denied June 21, 1962, and appellants' petition for a hearing by the Supreme Court was denied July 25, 1962. Dooling, J.,* participated in place of Traynor, J.

---

*Assigned by Chairman of Judicial Council.