[Crim. No. 16947. First Dist., Div. Two. Dec. 20, 1978.]

THE PEOPLE, Plaintiff and Appellant, v.
WILLARD DEAN PARK, Defendant and Respondent.

554

■■■■■■■

## COUNSEL

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Derald E. Granberg, Eugene Kaster and Stan M. Helfman, Deputy Attorneys General, for Plaintiff and Appellant.

Feldman, Waldman & Kline and Richard L. Jaeger for Defendant and Respondent.

## OPINION

**KANE, J.**—By information defendant Willard Dean Park (respondent) was charged with two counts of grand theft in violation of Penal Code, section 487, and one count of selling securities without registration in violation of Corporations Code,[1] section 25110. The background facts giving rise to the criminal charges may be summarized as follows:

In December 1973, Sylvia W. Sullivan discussed with Douglas A. Freeman the possibility of investing in a condominium project called Casa Grande, to be built by T J Investment Co., Inc. (Corporation) at 532, 536 and 538 Callan Street, San Leandro. On January 13, 1974, she gave $20,000 to Freeman for the explicit purpose of investing in the project. In addition to Sullivan, Freeman succeeded in convincing another woman, Margaret A. Martin, to invest in the project. Raising the money by the sale of her home and furniture, on January 18, 1974, Martin delivered to Freeman $20,000 to be used solely for the purpose of investing in the Casa Grande project.

According to a preliminary arrangement, the investors were to receive for their $40,000 investment the first $55,000 profit to be realized from the

---

[1]Unless otherwise indicated, all references will be made to the Corporations Code of California.

sale of the completed project. Freeman, who dealt directly with respondent and acted on behalf of the investors with respect to the project, was entitled to 10 percent of the profits to be earned by the investors, and in addition thereto he was to receive a 6 percent finder's fee from the Corporation. The record discloses that Freeman in fact did get a $2,400 finder's fee for his effort in acquiring the $40,000 investment capital from Sullivan and Martin.

In order to carry out the terms of the initial arrangement, Freeman and respondent signed an agreement on January 18, 1974 (Agreement). The Agreement called for the Corporation to acquire three lots in San Leandro on which a 16-unit condominium project would be constructed; and that in return for the $40,000 investment capital the Corporation would pay $55,000 from its first profit realized from the sale of the project. Significantly enough, however, the Agreement made no provision whatsoever for control, discretion or participation in the project by the investors. As a matter of fact, the Agreement failed even to name the actual investors who advanced the capital, simply describing Freeman as the "agent and trustee for certain persons."[2] It is undisputed that the Agreement which evidenced the debt incurred by the Corporation and served as a security therefor was not registered as required by the Corporations Code (§ 25100 et seq.).

---

[2]The relevant provisions of the Agreement read as follows:

"This agreement made by and between T J Investment Co., Inc., a California corporation, (hereafter referred to as 'Corporation') and Douglas A. *Freeman, c/o Sentinel Enterprises, Inc.,* P. O. Box 2458, Menlo Park, California, *as agent and trustee for certain persons,* (hereafter referred to as 'Freeman').

"WHEREAS, the Corporation is to acquire certain land and construct and sell a condominium project of sixteen (16) units called Casa Grande at 532, 536, and 538 Callan Street in the City of San Leandro, County of Alameda, State of California (hereafter referred to as 'condominium project').

"WHEREAS, *Freeman, as agent and trustee for certain persons, desires to invest the sum of Forty Thousand Dollars ($40,000) for the purchase of an equity in the first Fifty Five Thousand Dollars ($55,000) of the net profits to be realized from the sale and closing of the condominium project.*

"NOW, THEREFORE, THE CORPORATION AGREES WITH FREEMAN, AND FREEMAN AGREES WITH THE CORPORATION, AS FOLLOWS:

"A) *Freeman, as agent and trustee for certain persons,* will invest the sum of Forty Thousand Dollars ($40,000) for the purchase of an equity in the first Fifty Five Thousand Dollars ($55,000) of the net profits to be realized from the sale and closing of the condominium project with payment to the Corporation upon the following terms and conditions:

"1) Fifteen Thousand Dollars ($15,000) to be paid to the Corporation upon execution of this agreement.

"2) Twenty Five Thousand Dollars ($25,000) to be paid on or before January 31, 1974.

"B) *The Corporation will undertake to acquire the land at 532, 536, and 538 Callan*

Although respondent was never given permission to use the money received from the investors for any purpose other than the Casa Grande project, and although respondent himself indicated to Freeman that the money in dispute would be used for development costs of the project, such as engineering, ground clearance, permits, and the like, the record is replete with evidence that respondent misappropriated the money for his own personal purposes. A summary of the pertinent financial transactions reveals that on January 16, 1974, respondent and his wife applied for a loan of $5,000 from the First State Bank of Northern California " 'to pay taxes.' " Simultaneously, they opened a personal joint tenancy checking account at the same bank and authorized deposit of the loan proceeds in that account. Respondent immediately issued a check to his wife from this new account for $3,000, although the $5,000 was not actually received into the account until January 18, 1974.

On January 21, 1974, Freeman deposited $15,000 into an escrow account with the First California Title Company pursuant to the Agreement. That same day, respondent withdrew the $15,000 and the next day deposited it into a new T J Investment Co., Inc. checking account at First State Bank.

The same day (January 22), respondent wrote two checks on the corporate checking account. One was for $9,000 payable to the Corporation. This money went into a separate account at Wells Fargo Bank. The other check for $4,500 went into respondent's personal joint account.

Also on that same day, respondent wrote numerous additional checks on the joint account, including one for $3,000 to the Internal Revenue Service for taxes; another for $1,000 to Creighton Churchill, attorney; another for $1,000 was withdrawn and deposited by respondent's wife at First Western Bank in Castro Valley. In addition, numerous smaller checks were also written on this joint account.

On January 31, 1974, an additional $25,000 was placed in the escrow account by Freeman pursuant to the Agreement. This total of $40,000 was all that was ever deposited in the escrow account. The same day

---

*Street in San Leandro, California and construct and sell the condominium project*; and, further, the Corporation will distribute to Freeman the first Fifty Five Thousand Dollars ($55,000) of net profits from the sale and closing of the condominium project, with the anticipation that the said distribution will be completed on or about November 30, 1974." (Italics added.)

respondent withdrew this money and deposited it in the account of the Corporation.

The very next day, respondent wrote two checks totaling $6,500 on the corporate account and deposited that amount of money in the personal joint account. He also wrote a check for $2,400 to Freeman for the finder's fee; in addition, he wrote a check for $1,000 to one Clarence E. Beaver as payment on a prior unrelated investment.

On February 1, 1974, $1,350 in the form of two checks went to respondent's wife from the joint account and were deposited to her account in First Western Bank in Castro Valley. On February 4, 1974, a debit memo was recorded against the joint account for $5,027.95, paying off the $5,000 tax loan. Between January 18 and February 6, numerous other checks were written out of the joint account for various purposes totaling $1,170.57.

In April 1974, Sullivan learned that there was a problem with the investment. Neither Sullivan nor Martin ever received any money back. The project was never built.

Based upon the foregoing facts the magistrate concluded that the criminal offenses included in the complaint were well founded, and as a result respondent was bound over to the superior court to answer the charges. Thereafter, an information was filed in the superior court accusing respondent of two counts of grand theft (Pen. Code, § 487) and one count of unlawful sale of an unqualified security (§ 25110). Respondent filed a motion to set aside the information pursuant to Penal Code, section 995, then separately moved to suppress evidence pursuant to Penal Code, section 1538.5. The trial court first granted the section 995 motion as to count three (§ 25110); then, after a further hearing, it granted the section 1538.5 suppression motion and dismissed the information.

The People contend on appeal that both rulings of the trial court are erroneous and that the information should be reinstated. For the reasons which follow, we agree with appellant and reverse the orders.

*Violation of Securities Law*: Before discussing the individual issues relating to the violation of section 25110, we spell out the basic rules pertaining to setting aside an information. █ As reiterated time and again, an information will not be set aside if there is some rational ground

for assuming the *possibility* that an offense has been committed and the accused is guilty of it. (*Rideout* v. *Superior Court* (1967) 67 Cal.2d 471, 474 [62 Cal.Rptr. 581, 432 P.2d 197]). ██ On a motion to set aside an information, the question of the guilt or innocence of the defendant is not before the court, nor does the issue concern the quantum of evidence necessary to sustain a judgment of conviction. The court is only to determine whether the magistrate, acting as a person of ordinary caution or prudence, could conscientiously entertain *a reasonable suspicion* that a public offense had been committed in which the defendant had participated (*People* v. *Jablon* (1957) 153 Cal.App.2d 456, 459 [314 P.2d 824]). ██ Neither the trial court in a Penal Code section 995 proceeding (*People* v. *Landry* (1964) 230 Cal.App.2d 775, 779 [41 Cal.Rptr. 202]; *Hacker* v. *Superior Court* (1968) 268 Cal.App.2d 387, 392-393 [73 Cal.Rptr. 907]) nor a reviewing court on appeal therefrom may substitute its judgment as to the weight of evidence for that of the committing magistrate. (*People* v. *Cirilli* (1968) 265 Cal.App.2d 607, 612-613 [71 Cal.Rptr. 604]; *Rideout* v. *Superior Court, supra*). ██ Although the magistrate in reaching his decision may weigh the evidence, resolve conflicts, and give and withhold credence to witnesses, such a balancing of the evidence is not within the power of a tribunal reviewing the magistrate's order (*Perry* v. *Superior Court* (1962) 57 Cal.2d 276, 283-284 [19 Cal.Rptr. 1, 368 P.2d 529]). ██ Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information (*People* v. *Hall* (1971) 3 Cal.3d 992, 996 [92 Cal.Rptr. 304, 479 P.2d 664]; *People* v. *Harmon* (1973) 33 Cal.App.3d 308, 311 [108 Cal.Rptr. 43]).

██ When viewed in light of the foregoing principles, we believe the legal rules and the facts of the case unequivocally support the finding of the magistrate that a section 25110 violation occurred. It follows that the trial court's holding, that the transaction in the instant case was a limited partnership which did not contravene section 25110, must be held erroneous on both legal and factual grounds.

In elaborating on the legal issues, as a first step we outline the statutory and regulatory scheme relating to the subject matter. Section 25019 provides in relevant part that " *'Security' means any* note; stock; treasury stock; *membership in an* incorporated or unincorporated *association*; bond; debenture; evidence of indebtedness; *certificate of interest or participation in any profit-sharing agreement*; collateral trust certificate; preorganization certificate or subscription; transferable share; *investment contract*; voting trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas or mining title or lease

or in payments out of production under such a title or lease; any beneficial interest or other security issued in connection with a funded employees' pension, profit sharing, stock bonus, or similar benefit plan; or, in general, any interest or instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. All of the foregoing are securities whether or not evidenced by a written document." (Italics added.) Section 25110, the cardinal statute, prohibits the sale or offer of any security, unless the security has been first qualified or exempted.[3] Section 25102, subdivision (f), exempts from the provisions of section 25110, "Any offer or sale, in a transaction not involving any *public* offering, of any bona fide general partnership, joint venture or limited partnership interest . . ." (italics added). Lastly in defining nonpublic (private) offering and sale, California Administrative Code, title 10, section 260.102.2, sets out that an offer or sale of any bona fide general partnership, joint venture or limited partnership "does not involve any public offering if offers are not made to more than 25 persons *and* sales are not consummated to more than 10 of such persons, *and* if all of the offerees either have a preexisting personal or business relationship with the offeror or its partners, officers, directors or controlling persons or by reason of their business or financial experience could be reasonably assumed to have the capacity to protect their own interests in connection with the transaction." (Italics added.)

 In sum, the cited statutory provisions make it clear that a failure to register constitutes an *ipso jure* violation of section 25110 if the transaction at issue is an investment contract or an interest or participation in a profit-sharing agreement. In case the transaction qualifies as a bona fide partnership (general or limited) or a joint venture, it may be exempt from the registration requirement and the penal provisions of section 25110 if the offer or sale of the partnership or joint venture interest fails to constitute a public offering under the criteria set out in the regulation. We are firmly of the opinion that, when analyzed in light of the statutory and case law, the Agreement in dispute fairly qualifies as an investment contract and that, due to its conceded lack of

---

[3]Section 25110 sets forth that "*It is unlawful for any person to offer or sell* in this state *any security* in an issuer transaction (other than in a transaction subject to Section 25120), whether or not by or through underwriters, *unless such sale has been qualified* under Section 25111, 25112 or 25113 (and no order under Section 25140 or subdivision (a) of Section 25143 is in effect with respect to such qualification) *or unless such security or transaction is exempted* under Chapter 1 (commencing with Section 25100) of this part." (Italics added.)

registration, it automatically falls within the protective umbrella of section 25110. We are equally persuaded that even if classified as a joint venture or partnership interest, the transaction in controversy is still protected by section 25110 because the facts introduced in evidence fail to establish the requisite elements of exemption set out in section 25102, subdivision (f), and the regulatory provisions issued thereunder.

■ Under widely accepted judicial interpretation and definition, an investment contract for the purposes of securities laws means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party (*S. E. C.* v. *Howey Co.* (1946) 328 U.S. 293, 298-299 [90 L.Ed. 1244, 1249-1250, 66 S.Ct. 1100, 163 A.L.R. 1043]; *Securities & Exch. Com'n* v. *Glenn W. Turner Enter., Inc.* (D.Ore. 1972) 348 F.Supp. 766, 774; *Tomei* v. *Fairline Feeding Corp.* (1977) 67 Cal.App.3d 394, 400 [137 Cal.Rptr. 656]; *Oil Lease Service, Inc.* v. *Stephenson* (1958) 162 Cal.App.2d 100, 109 [327 P.2d 628]). As the court explained in *Securities & Exch. Com'n* v. *Glenn W. Turner Enter., Inc.,* *supra,* at page 775, ■ "The most essential consistency in the cases which have considered the meaning of 'investment contract' is *the emphasis on whether or not the investor has substantial power to affect the success of the enterprise.* When his success requires professional or managerial skill on his part, and he has authority corresponding with his responsibility, his investment is not a security within the meaning of the securities act. *When he is relatively uninformed and unskilled and then turns over his money to others, essentially depending upon their representations and their honesty and skill in managing it, the transaction is an investment contract.*" (Italics added.)

■ The transaction at bench falls squarely within this stated definition of investment contract. Both the Agreement and the oral evidence introduced at the preliminary hearing support the view that the transaction involved an investment of funds in respondent's alleged land development and condominium project to be built in the future; that the profit to be realized from the investment was expected solely from respondent's efforts; that the investors had no control over the management of the enterprise and had no power whatsoever to affect the fortune of the project; and that the success of the enterprise depended solely on the honesty and managerial skill of respondent. Since there was a prima facie showing that the transaction between the parties constituted an investment contract which was not registered, the securities violation

charge contained in count three should have been upheld for this reason alone.[4]

But, even if it is assumed *arguendo* that the transaction in dispute was not an investment contract, respondent's claim that a joint venture or partnership was created which was exempt from section 25110 cannot be accepted for two major reasons.

■ One, it is well established that the essential elements of both a joint venture and partnership are a sharing of profits as well as losses and a right to joint management and control of the business (*Holtz* v. *United Plumbing & Heating Co.* (1957) 49 Cal.2d 501, 506-507 [319 P.2d 617]; *Constans* v. *Ross* (1951) 106 Cal.App.2d 381, 386 [235 P.2d 113]; *Kersch* v. *Taber* (1945) 67 Cal.App.2d 499, 504 [154 P.2d 934]; 40 Cal.Jur.3d, §§ 1-3, pp. 181-184; Lattin on Corporations (1959) pp. 6, 8). ■ In addition, the question whether a partnership or joint venture has been formed is a factual issue to be determined from the intention of the parties ascertained from the terms of the agreement and the surrounding circumstances (*Constans* v. *Ross, Kersch* v. *Taber*, both *supra;* 40 Cal.Jur.3d, § 6, pp. 186-187; 6 Witkin, Summary of Cal. Law (8th ed. 1974), § 23, p. 4275).

■ In the case at bench the parties agreed only with respect to the sharing of profits, but made no provisions as to the distribution of losses. Furthermore, as noted earlier, the investors were accorded no right whatsoever to participate in the management or to exercise control over the enterprise. Finally, there is not a shred of evidence that by investing a fixed sum in the Casa Grande project either the investors and/or respondent intended to create a joint venture or a partnership. As pointed out before, the Agreement is not only silent with regard to an intent to form a joint venture or a partnership (limited or general), but fails even to designate or mention Sullivan and Martin, the actual investors. The parol evidence introduced at the preliminary hearing is likewise devoid of any reference to creation of a joint venture or partnership between and among the parties.

■ Two, respondent's claim must be rejected for the additional consideration that the evidence fails to substantiate that the security

[4]In view of the above conclusion, we need not decide whether the evidence introduced at the preliminary hearing would have supported the position that the Agreement in question constituted "security" within the meaning of section 25019, because it involves a certificate of interest or participation in a profit-sharing agreement (see *Smith* v. *Sherman* (1962) 206 Cal.App.2d 93, 95 [23 Cal.Rptr. 487]; 44 Cal.Jur.2d, § 26, fn. 13, at p. 671).

interests were exempted from registration on the ground that the sale or offering constituted a private offering within the meaning of the law. As the cases emphasize, the main objective of the securities law is to protect the public against the imposition of insubstantial, unlawful and fraudulent stock and investment schemes (*People* v. *Syde* (1951) 37 Cal.2d 765, 768 [235 P.2d 601]; *Craft* v. *Brooks* (1962) 204 Cal.App.2d 187, 188 [22 Cal.Rptr. 68]), and to promote full disclosure of all information that is necessary to make informed and intelligent investment decisions (*S. E. C.* v. *Ralston Purina Co.* (1953) 346 U.S. 119, 124, 126-127 [97 L.Ed. 1494, 1498, 1499-1500, 73 S.Ct. 981]; *Doran* v. *Petroleum Management Corp.* (5th Cir. 1977) 545 F.2d 893, 900). In accordance therewith the regulation in California explicitly provides that in order to grant the offeror the private offering exemption, *all the offerees* to the transaction must have either a preexisting personal or business relationship with the offeror or must be sophisticated investors who are able to protect their own interest in connection with the transaction (Cal. Admin. Code, *supra,* tit. 10, § 260.102.2).

 The record fails to bear out either of the stated conditions. While there is some indication that both Sullivan and Martin had met with Duffy, the president of the Corporation, prior to the transaction at issue, it is unquestionable that occasional meetings between the offeror and offerees without demonstrating the true nature of the relationship between them, do not satisfy the regulatory condition for private exemption. In addition, the record is devoid of any showing that Sullivan and Martin were sophisticated investors who were capable of protecting their own interest, much less that respondent made the requisite data available to the investors for the purpose of enabling them to make intelligent investment decisions. What was said in *Doran* v. *Petroleum Management Corp., supra,* 545 F.2d at page 903, is applicable here: "In short, there must be sufficient basis of accurate information upon which the sophisticated investor may exercise his skills. Just as a scientist cannot be without his specimens, so the shrewdest investor's acuity will be blunted without specifications about the issuer. For an investor to be invested with exemptive status he must have the required data for judgment."

 Respondent's additional arguments pertaining to the exemption from section 25110 do not require an extended discussion. The contention that even if Sullivan and Martin did not have the requisite sophistication,

the private offering exemption should obtain because the knowledge of Freeman, their agent, must be imputed to them as principals, may be briefly disposed of. While in general the knowledge of an agent which he is under a duty to disclose is to be imputed to the principal, it is well established that where the agent acts in his own interest or *where the interest of the agent is adverse to his principal, the knowledge of the agent will not be imputed to the principal* (*Sands* v. *Eagle Oil & Refining Co.* (1948) 83 Cal.App.2d 312, 319 [188 P.2d 782]; *Mott* v. *Nardo* (1946) 73 Cal.App.2d 159, 165 [166 P.2d 37]; 1 Witkin, Summary of Cal. Law, *supra,* Agency and Employment, § 145, p. 747). The record here convincingly shows that Freeman was a double agent who acted not only on behalf of the investors, but also for respondent; and that as a result of his efforts he received a substantial finder's fee from respondent. Since Freeman had a clear adverse interest in the matter, his knowledge was not imputable to Sullivan and Martin.

Respondent's contention that the lack of exemption constituted an element of the offense and should have been proven by appellant is patently meritless. Section 25163 expressly provides that "In *any* proceeding under this law, the burden of proving an exemption or an exception from a definition is upon the person claiming it." (Italics added.) ▊ In elaborating on the statute, the case law has consistently held that the public offering exception is not an element of the prohibited sale of a security (*Domestic & Foreign Pet. Co., Ltd.* v. *Long* (1935) 4 Cal.2d 547, 557 [51 P.2d 73]; *Craft* v. *Brooks, supra,* 204 Cal.App.2d 187, 193), but constitutes only a defense which is to be proven by the defendant. This proposition has been graphically demonstrated in *People* v. *Murphy* (1936) 17 Cal.App.2d 575 [62 P.2d 592], where interpreting the predecessor of the present Corporate Securities Act the court stated as follows: "Section 3 of that act defines the offense. . . . It provides in part: [¶] 'No company shall sell any security, except upon a sale for a delinquent assessment . . . , or offer for sale, negotiate for the sale of, or take subscriptions for any security of its own issue until it shall have first applied for and secured from the commissioner a permit authorizing it so to do.'

"It is true that section 2 of that act, which primarily seeks to define particular words and terms of the act, does contain certain specified exceptions to which it is declared the act does not apply. *These exceptions are not affirmative matters necessary to constitute the crime. They contain mere negative circumstances* which are deemed to constitute a lawful sale of securities as distinguished from the unlawful sale of stock which is prohibited by the statute. *These exceptions are matters of defense to a*

*charge of unlawful sale of stock, which defenses may be made by the accused. . . .*

"*It was not necessary that the information should negative or state the matters contained in the foregoing exception to the provisions of the act.* That paragraph of the act merely declares certain negative circumstances which are not deemed to come within the inhibitions of the securities act. *To sustain a conviction of unlawfully selling stock without a permit, it was not necessary to allege or prove the negative circumstances* enumerated in section 2(c) 3 of the act, *which constitute mere exceptions to the inhibitions of the law. Those were matters of defense.* [Citations.] . . .

"*Since the negative matter contained in the exception to the offense of unlawfully selling stock without a permit is not an essential part of the prohibited crime, it was not necessary that those circumstances should be alleged in the information or proved. It was merely a matter of defense.*" (Pp. 586-587, italics added. See also *People* v. *H. Jevne Co.* (1919) 179 Cal. 621, 625-627 [178 P. 517]; *People* v. *Mason* (1960) 184 Cal.App.2d 317, 356 [7 Cal.Rptr. 627]; *People* v. *Hyden* (1953) 118 Cal.App.2d 744, 747-748 [258 P.2d 1018]; *People* v. *Main* (1925) 75 Cal.App. 471, 473 [242 P. 1078].)

*Suppression of Evidence:* Appellant's second major attack is directed against the trial court's ruling suppressing evidence pursuant to Penal Code, section 1538.5. Before discussing and determining the issues raised with respect to this matter, we first describe the factual background leading to the suppression motion.

In late October 1974, the Department of Corporations served a subpoena duces tecum upon the First State Bank of Northern California, Headquarters Branch, San Leandro, seeking certain bank records. The subpoena incorporated, and was accompanied by, a declaration which specified the materials sought and designated the purpose for which the records and papers were requested.[5] The bank voluntarily complied with

---

[5]The declaration signed under penalty of perjury reads in pertinent part as follows:

"Declarant alleges that FIRST STATE BANK OF NORTHERN CALIFORNIA, has in its possession or in its control the following documents: checks, ledger sheets, statements, signature cards, bank accounts, savings accounts, trust accounts, safety deposit boxes, loan application, loan accounts, documents and other papers *pertaining to the matter of an examination and investigation of T. J. INVESTMENT COMPANY, INC., SENTINAL ENTERPRISES, INC., DOUGLAS A. FREEMAN, WILLARD D. PARK* and of their books, records, accounts and other papers.

"Declarant alleges that the above documents are material to the proper conduct of this

the subpoena and provided all the materials for the Department of Corporations prior to December 30, 1974. The department reviewed the materials in the course of its investigation and discovered apparent evidence of violations of the criminal law. As a result, the department handed over the materials to the district attorney's office for prosecution on or about March 19, 1975.

Respondent's motion to suppress was presented to the trial court on alternate grounds: first, that the suppression was automatically mandated under *Burrows* v. *Superior Court* (1974) 13 Cal.3d 238 [118 Cal.Rptr. 166, 529 P.2d 590]; second, that suppression was required due to the fact that the subpoena was overbroad, too indefinite and failed to make an adequate showing of relevancy. The trial court granted the motion on the basis that the subpoena was not specific enough. On appeal, respondent renews his arguments advanced in the superior court and claims that the suppression order should be sustained either by application of *Burrows* to the instant case and/or because of the overbreadth and indefiniteness of the subpoena.

In *Burrows* v. *Superior Court, supra,* the California Supreme Court held that a bank depositor has a reasonable expectation that his bank will maintain the confidentiality of records which originate with him, and that the bank's voluntary surrender of the records to the police without aid of any legal process constitutes an illegal search and seizure. However, in subsequent cases the Supreme Court has made it clear that *Burrows* is to be applied prospectively only. Thus, in *People* v. *Kaanehe* (1977) 19 Cal.3d 1 [136 Cal.Rptr. 409, 559 P.2d 1028], defendant, relying on *Burrows,* argued that the surrender of his bank records to law enforcement officers without his knowledge or consent constituted an unreasonable search and seizure. In rejecting defendant's argument, the Supreme Court held that "*Burrows* is applicable only to records *seized* after the date that the decision [i.e., *Burrows*] became final." (P. 10, italics added.) In *Athearn* v. *State Bar* (1977) 20 Cal.3d 232 [142 Cal.Rptr. 171, 571 P.2d 628], petitioner claimed that he was denied due process because the State Bar subpoenaed his bank records and canceled checks without prior notice to him. In refuting petitioner's argument, the Supreme Court

examination and investigation by reason of the following facts: *All of said documents are necessary and material to an investigation and examination being conducted by the Commissioner of Corporations pursuant to Section 25531(c) of the California Corporations Code in that the information contained therein will reveal whether* in the matter of an examination and investigation of *T. J. INVESTMENT COMPANY, INC., SENTINAL ENTERPRISES, INC., DOUGLAS A. FREEMAN, WILLARD D. PARK* and of their books, records, accounts and other papers, or the officers, directors, agents, employees and/or shareholders of said entities, *have acted in violation of the Corporate Securities Law of the State of California."* (Italics added.)

reaffirmed the prospective application of *Burrows,* in the following language: "It is now established that a bank customer has both a reasonable expectation of privacy (*Burrows* v. *Superior Court* (1974) 13 Cal.3d 238 [118 Cal.Rptr. 166, 529 P.2d 590]) and a right to notice and opportunity to be heard when his bank records are subpoenaed (*Valley Bank of Nevada* v. *Superior Court* (1975) 15 Cal.3d 652 [125 Cal.Rptr. 553, 542 P.2d 977]). However, in *People* v. *Kaanehe* (1977) 19 Cal.3d 1 [136 Cal.Rptr. 409, 559 P.2d 1028], *we held Burrows to apply only to records seized after that decision became final* since '. . . the interest to be vindicated is one which is merely collateral to a fair determination of guilt or innocence.' (*Id.,* at p. 10.) *It follows the rule of Valley Bank is to be applicable only to records subpoenaed following finality of that decision. Thus, since bank records in these proceedings were obtained by subpoena prior to the effective dates of both Burrows and Valley Bank, petitioner is not entitled to rely on those authorities.*" (*Athearn* v. *State Bar, supra,* at p. 235; italics added.)

As indicated earlier, in the case at bench the subpoena was served upon the bank before rendition of the decision in *Burrows,* and the materials subpoenaed were furnished to the Department of Corporations prior to the date *Burrows* became final. These facts, of course, bring the instant case within the four corners of *Athearn.*

Respondent's suggestion that in the case at bench a different rule should apply, because the materials lawfully obtained by the Department of Corporations were passed on to the county district attorney after the effective date of *Burrows,* grossly misses the point, namely, that the crucial moment when the applicability of *Burrows* commences is the time when the material was seized and/or when the subpoena was issued (see *People* v. *Kaanehe* and *Athearn* v. *State Bar,* both *supra*). Besides, respondent's position is predicated on the erroneous premise that the Department of Corporations is not a law enforcement agency and that the material obtained by subpoena by the department somehow retains its confidentiality. The statutory scheme, however, fails to support any of these assumptions.

Thus, the statute makes it clear that the Department of Corporations is not an isolated legal entity, but an integral part of the executive branch of the government. The department is authorized to investigate and prosecute actions concerning violation of any law or rule or order of the department (Gov. Code, §§ 11180-11181). In case of finding a violation of the law, the department itself may bring a civil action to enjoin the violation (§§ 25530-25532), and in the event a criminal prosecution is

warranted, the commissioner may refer the evidence pertaining to any violation of the law to the county district attorney for the purpose of instituting appropriate criminal proceedings against the violator (§ 25533).[6] ▆ In short, while the information obtained through the investigative efforts of the department retains its confidential character in that it cannot be divulged without reason to the public at large (Gov. Code, § 11183), the confidentiality of the materials does not apply within the government agencies *inter sese* (cf. § 25605), especially toward the district attorney whose statutory duty includes the prosecution of violation of criminal laws (Gov. Code, § 11157). ▆ In light of the case law and the cited statutory provisions, respondent's contention that the delivering of the bank records to the district attorney after the effective date of *Burrows* violated his constitutional right to privacy must be rejected.

▆ Respondent's alternative challenge that the suppression of the bank records was proper because the subpoena and the supporting declaration were too vague and indefinite (*Brovelli* v. *Superior Court* (1961) 56 Cal.2d 524 [15 Cal.Rptr. 630, 364 P.2d 462]; *Fielder* v. *Berkeley Properties Co.* (1972) 23 Cal.App.3d 30 [90 Cal.Rptr. 791]; *People* v. *West Coast Shows, Inc.* (1970) 10 Cal.App.3d 462 [89 Cal.Rptr. 290]), calls for but a short answer. In *People* v. *Warburton* (1970) 7 Cal.App.3d 815 [86 Cal.Rptr. 894], the court held that when a custodian of records and papers produces them in response to a subpoena duces tecum, without questioning the regularity of the subpoena procedure (including the vagueness or indefiniteness of the subpoena), the defendant is not entitled to suppression of evidence under Penal Code, section 1538.5 (*id.,* p. 825). As the court explained, "Where the custodian chooses to disregard defects in the process, and comes forward with the papers and records, his Fourth Amendment rights have not been invaded." (*Id.,* p. 824.) Since the evidence here establishes beyond peradventure that the bank voluntarily complied with the allegedly overbroad subpoena, any right predicated on the latter defect has been waived.

▆ For the first time on appeal, respondent raises the issue that the entire information is also barred by the statute of limitations. Respondent cites Penal Code, section 800, which provides that an information charging the commission of a felony must be filed within three years after its commission (or in case of grand theft, within three years after its

---

[6]Section 25533 provides that "*The commissioner may refer* such *evidence* as is available *concerning any violation of this law* or of any rule or order hereunder *to the district attorney of the county* in which the violation occurred, who may, with or without such a reference, institute appropriate criminal proceedings under this law." (Italics added.)

discovery),[7] and points out that the information here shows on its face that it was filed beyond the allowed three-year period. Respondent insists that the commencement of the prosecution within the statutory period of limitation is jurisdictional (*People* v. *McGee* (1934) 1 Cal.2d 611, 613 [36 P.2d 378]), and that the People are barred from refiling the information to remedy the defect. Respondent's position is not well taken.

Although the information here indeed shows on its face that it was filed after the prescribed statutory period,[8] the legal consequence claimed by respondent does not follow. In the first place, Penal Code, section 802, sets up a well known exception to section 800 of the Penal Code, by providing that ". . . *no time during which the defendant is not within this State, is a part of any limitation of the time for commencing a criminal action.*" (Italics added.) Consolidated civil actions which arose out of the same events as the instant case and were also filed in the court below,[9] conclusively establish that respondent was out of the state for a period of eight months, commencing about nine months after the date upon which the alleged offenses were committed. Respondent's absence from the state for the stated period, of course, tolled the statute of limitations pursuant to section 802 of the Penal Code and rendered the filing of the information timely.

In the second place, respondent's argument notwithstanding, the trial court may permit the amendment of the information or the filing of an amended complaint at any stage of the proceedings for any defect or

[7]Penal Code, section 800, provides that "*An indictment for any felony*, except murder, voluntary manslaughter, involuntary manslaughter, the embezzlement of public money, the acceptance of a bribe by a public official or a public employee, grand theft, forgery, the falsification of public records, a violation of Section 72, 118, 118a, 132, 134, or 209 of the Penal Code, or Section 1090 or 27443 of the Government Code, *shall be found, an information filed,* or case certified to the superior court *within three years after its commission.* An indictment for the acceptance of a bribe by a public official or a public employee, a felony, shall be found, an information filed, or case certified to the superior court within six years after its commission. *An indictment for grand theft,* forgery, voluntary manslaughter, or involuntary manslaughter, a violation of Section 72, 118, 118a, 132 or 134, of the Penal Code, or Section 1090 or 27443 of the Government Code, *shall be found, an information filed,* or case certified to the superior court *within three years after its discovery.*" (Italics added.)

[8]The information charges that the grand thefts were committed by defendant on January 13 and 18, 1974, respectively (counts one and two) and the securities violation (count three) on January 18, 1974. At the same time the record indicates that the information was filed March 11, 1977, over three years after the alleged commission of the charged felonies.

[9]We take judicial notice of the cited civil actions pursuant to Evidence Code, section 452, subdivision (d).

insufficiency except that the accusation cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary hearing (Pen. Code, § 1009). In accordance with the statute, cases hold that an amendment to toll the statute of limitations does not change the offense charged and thus is permissible (*People* v. *Crosby* (1962) 58 Cal.2d 713, 723-724 [25 Cal.Rptr. 847, 375 P.2d 839]; *People* v. *Morgan* (1977) 75 Cal.App.3d 32, 37-38 [141 Cal.Rptr. 863]).

The orders are, and each is, reversed.

Upon resumption of proceedings in the trial court, the People may file a motion to amend the information to allege facts purporting to establish the timeliness of the filing of the offenses charged pursuant to sections 800 and 802 of the Penal Code.

Taylor, P. J., and Rouse, J., concurred.

A petition for a rehearing was denied January 19, 1979.