[L.A. No. 29773. In Bank. Dec. 17, 1970.]

SOUTHERN CALIFORNIA FIRST NATIONAL BANK,
as Administrator With the Will Annexed, etc., Plaintiff and Respondent, v.
QUINCY CASS ASSOCIATES et al., Defendants and Appellants.

## COUNSEL

Hansen & Dolle and Victor R. Hansen for Defendants and Appellants.

Beardsley, Hufstedler & Kemble, Charles E. Beardsley and Harry L. Hupp for Plaintiff and Respondent.

## OPINION

**McCOMB, J.**—Defendants appeal from a judgment in favor of plaintiff in an action to impose a constructive trust on certain stock.

*Facts:* Kenneth B. Cannon (hereinafter referred to as "decedent") owned a business which he desired to expand. January 18, 1950, he executed a letter agreement with defendant Quincy Cass Associates, a California corporation (hereinafter referred to as "QCA"), in which decedent agreed to incorporate his business as Eastman Pacific Company (hereinafter referred to as "Eastman") in return for 30,000 shares of common stock and to give QCA 5,000 shares if and when QCA raised $100,000 in additional capital. January 26, 1950, Eastman was incorporated, and June 2, 1950, the Commissioner of Corporations issued a permit authorizing the issuance of 30,000 shares of stock to decedent for the transfer of his business to Eastman.

July 10, 1950, Eastman applied to the Commissioner of Corporations for permission to issue preferred stock and also to issue common stock in exchange for that previously issued to decedent. October 3, 1950, the commissioner issued a permit authorizing Eastman to issue 85,820 shares of common stock to decedent and "2. To sell and issue an aggregate of

not to exceed 12,000 of its Participating Preferred shares, at par, for cash, lawful money of the United States, for the uses and purposes recited in its application, subject to an aggregate selling expense of not to exceed 20% of the amount received in cash on account of the selling price thereof, payable in cash (or partly in stock as provided by paragraph 3 hereof), including commissions payable only to duly licensed brokers or agents.

"3. Whenever and as often as 4 shares of Participating Preferred stock may be sold and issued under paragraph 2 hereof, and a liability to pay such 20% selling commission has been incurred, to sell and issue 1 of its Common shares in cancellation of one-fourth of such liability so incurred, not to exceed an aggregate of 3,000 Common shares."

Certain conditions were imposed by the permit, including the following: "That none of the shares . . . shall be sold or issued unless and until the applicant first shall have selected an escrow holder and said escrow holder shall have been first approved in writing by the Commissioner of Corporations; that, when issued, all certificates evidencing any of said shares shall be forthwith deposited with said escrow holder, to be held as an escrow pending the further written order of the said Commissioner; that the receipt of said escrow holder for said certificates shall be filed with said Commissioner; and that *the owner or persons entitled to said shares shall not consummate a sale or transfer of said shares, or any interest therein, or receive any consideration therefor, until the written consent of said Commissioner shall have been obtained so to do."* (Italics added.)

Between October 30, 1950, and November 14, 1950, Eastman issued 85,820 shares of common stock to decedent, in the form of a series of certificates, all of which were deposited in escrow. One certificate, No. 34, was for 11,000 shares.

QCA sold the 12,000 shares of Eastman participating preferred stock authorized by the October 3, 1950, permit and received the authorized commission, one-fourth in the form of 3,000 shares of common stock and the remainder in cash.

November 20, 1950, decedent wrote a letter to QCA, providing in part: "The Eastman Pacific Company has been incorporated. I have assigned to the company all of my various enterprises and received in return 30,000 shares of stock. Upon receipt of these shares, I had certificate No. 4 issued in the amount of 5000 shares, holding them to be delivered to you under the terms of that Agreement [the letter agreement of January 18, 1950].

"After the issuance of the above mentioned 30,000 shares, the officers of the company, including myself, agreed with you that our original under-

taking should be modified and a permit requested from the Corporation Department allowing the company to issue 85,820 shares to me in return for cancellation of the originally issued 30,000 shares and that instead of 5000 shares to be received by you under conditions of the contract, you should receive 11,000 shares out of the 85,820 shares issued.

"A permit was obtained from the Corporation Department allowing the issuance of these 85,820 shares to me with the restriction, however, that they be placed in escrow pending further instructions of the Corporation Department. I have caused these shares to be issued, including one certificate No. 34 for 11,000 shares.

"By this writing, I acknowledge the fulfillment by you of all of the terms of the contract dated January 18, 1950, with modifications described in this writing, including completion of financing of the Eastman Pacific Company and the raising of $100,000 through the sale of preferred stock and acknowledge receipt of full consideration and undertake to deliver to you certificate No. — for 11,000 shares now held in escrow *when and as permission to transfer the stock is given by the Corporation Department.*

"During the period this certificate, evidencing these shares, is held in escrow and until they are delivered to you, I hereby grant to you a right to receive all dividends paid on these 11,000 shares and my proxy to vote them at any and all times and to exercise all the prerogatives of ownership, subject only to the order of the Corporation Department heretofore mentioned." (Italics added.)

January 14, 1952, QCA declared a stock dividend to its shareholders consisting of the 11,000 shares of Eastman stock represented by certificate No. 34, which remained in escrow in decedent's name. This stock dividend was based on decedent's letter of November 20, 1950, and delivery of the stock to QCA's shareholders was made subject to the consent of the Commissioner of Corporations. The shareholders of QCA entitled to receive the stock dividend, or their successors in interest, are the individual defendants herein.

Decedent died August 13, 1962, almost 12 years after he sent QCA his letter of November 12, 1950, and over 10½ years after QCA declared the stock dividend of the 11,000 shares of Eastman stock represented by certificate No. 34. During all that time, certificate No. 34 remained in escrow in decedent's name.

April 15, 1963, defendant Quincy Cass and his associate, defendant Frank Foellmer, were elected president and secretary, respectively, of Eastman, and Foellmer was elected to Eastman's board of directors.

Quincy Cass and another associate, defendant Ned Leavitt, were already members of the board.

Before he died, decedent had been searching for a buyer for Eastman and had contacted Anchor Coupling Company. Following decedent's death, the Commissioner of Corporations approved a plan to liquidate Eastman, pursuant to which plan Eastman's assets were to be sold to Anchor Coupling for 25,000 of the latter's shares and some cash.

In August 1963, Quincy Cass, as president of Eastman, filed an application with the Commissioner of Corporations for permission to cancel the escrow provisions on the 85,820 shares of Eastman common stock, so that the shares might be distributed to their owners. The commissioner issued an order permitting release of the shares from escrow, upon the condition they be cancelled immediately. Since the money and stock to be distributed to Eastman's shareholders as a liquidating dividend were not ready for distribution, Frank Foellmer, as an officer of Eastman, obtained permission to delay cancellation for a short period of time, in order that the liquidating dividend could be distributed.

September 20, 1963, Quincy Cass and Frank Foellmer, acting as officers of Eastman, caused certificate No. 34, representing 11,000 shares, to be cancelled; and, in its place, without obtaining the consent of the Commissioner of Corporations or an assignment from plaintiff, they caused to be issued to the shareholders of QCA certificates Nos. 109 through 114, representing 11,000 shares.

By October 4, 1963, Eastman's creditors and the holders of its preferred stock had been paid off, and 25,000 shares of Anchor Coupling had been issued to Eastman. At that time, Eastman was holding as assets only Anchor Coupling shares and cash. The liquidating dividend for the 11,000 shares represented by certificates Nos. 109 through 114 consisted of 1,430 shares of Anchor Coupling and $1,054 in cash; and such assets were distributed to the holders of those certificates. October 9, 1963, Eastman filed with the Secretary of State a final certificate of dissolution.

July 25, 1966, the present action was filed, seeking to have a constructive trust imposed on the proceeds of certificate No. 34 (or certificates Nos. 109 through 114) in defendants' hands, an accounting, damages for conversion, and declaratory relief.[1] Among other things, the trial court found: "3. The agreement of November 20, 1950, of [decedent] to deliver Certificate No. 34 and the shares said certificate represented of

---

[1]Following decedent's death, Clyde R. Burr was appointed executor of his will. It was Burr who filed the present action; but he died pending this appeal, and Southern California First National Bank was substituted as plaintiff herein.

[Eastman], to [QCA], was a promise to pay a sales commission to said [QCA] for its services as a securities broker in selling the preferred stock of [Eastman].

"4. Plaintiff is not estopped to assert his claims herein, in that neither plaintiff nor [decedent] by their acts or conduct misled defendants, nor did defendants rely on the acts or conduct of plaintiff or [decedent], nor were defendants ignorant or uninformed as to any relevant facts, nor were plaintiff and [decedent] fully informed of all the facts or law at any relevant time, nor did plaintiff or [decedent] do any acts or assert any facts upon which they intended defendants to rely to their detriment.

"5. Neither plaintiff nor [decedent] was in *pari delicto* or equal fault with defendants or any of them.

"6. The letter agreement of November 20, 1950, violated the conditions of the permit of October 3, 1950, in that:

"(a) The purported transfer of Certificate No. 34 and the shares it represented to [QCA] was made while said share certificate was held in escrow, and no order of the Commissioner of Corporations was obtained either before or after said date permitting the transfer;

"(b) The consideration for the said purported transfer passed without an order of the Commissioner of Corporations; and

"(c) The consideration for said transfer constituted a selling commission in excess of that allowed by said permit.

"The purported transfer of said Certificate No. 34 and the shares it represented was a nullity.

"7. The transfer by [QCA] on January 14, 1952, of interests in and to share [*sic*] of stock represented by Certificate No. 34 to various defendants herein or their predecessors created no interest in said defendants or their predecessors, in that [QCA] had no interest in said shares and the purported transfer of said shares to the various defendants or to their predecessors and subsequently to defendants, was in violation of the conditions of the permit of October 3, 1950.

"8. The issuance of Certificates Nos. 109 through 114, respectively, of [Eastman], created no interest in the persons to whom said certificates purported to be issued, in that there was no valid transfer to said persons or their predecessors of the shares represented by Certificate No. 34, and in that there was no permit from the Commissioner of Corporations for the issuance of said shares, and no order permitting the transfer of the shares represented by Certificate No. 34.

"9. The defendants . . . acquired their respective portions of the liquidating dividend of [Eastman] attributable to Certificate No. 34 of said company as trustees for plaintiff.

"10. The defendants Quincy Cass and Frank Foellmer, for themselves and as agents of [QCA], used their position as officers and directors of [Eastman] to cause the issuance of Certificates 109 through 114, and to cause the issuance of the liquidating dividend to the defendants as hereinabove set forth."

From its findings, the trial court concluded: "1. The purported transfer of Certificate No. 34 of [Eastman], and its proceeds, to defendant [QCA], and thence by [QCA] to the remaining defendants, was illegal, void, and a nullity, and created no interest in and to the shares represented by said Certificate No. 34 in the defendants or any of them.

"2. The defendants hold the proceeds of Certificate No. 34, plus all dividends, income, profits, accretions and proceeds therefrom, in trust for the plaintiff, and should account to the court for the same.

"3. The plaintiff and [decedent] are not estopped to obtain relief herein.

"4. The plaintiff and [decedent] are not in *pari delicto* or equal fault with defendants or any of them.

"5. The defendants Quincy Cass, Frank Foellmer, and [QCA] converted Certificate No. 34 and its proceeds and should respond to the plaintiff in damages therefor."

■ Question: *Did the trial court properly set aside the transfer of the liquidating dividend to the shareholders of QCA?*

*Yes.* Defendants' claim is based entirely on the letter agreement of November 20, 1950, and as found by the trial court, that agreement violated the conditions of the permit of October 3, 1950, in that (1) the purported transfer of the 11,000 shares of Eastman's stock represented by certificate No. 34 was made while the certificate was held in escrow, and no order of the Commissioner of Corporations was obtained permitting the transfer, (2) the consideration for the purported transfer passed without an order of the commissioner, and (3) the consideration therefor constituted a selling commission in excess of that allowed by the permit. As a result, the trial court found that the letter agreement did not effect a transfer of the 11,000 shares, that the purported transfer of the shares by QCA as a stock dividend to its shareholders January 14, 1952, created no interest in any of the defendants or their predecessors in interest, and that the issuance of certificates Nos. 109 through 114 created no interest in the persons to whom said certificates purported to be issued.

At the time here involved, section 26100 of the Corporations Code provided: "Every security of its own issue sold or issued by any company without a permit of the commissioner then in effect authorizing the issuance or sale of the security is void. Every security of its own issue sold or issued by a company with the authorization of the commissioner but which has been sold or issued in nonconformity with any provision in the permit authorizing the issuance or sale of the security is void." Under the circumstances, the transfers were clearly void. (*N. C. Roberts Co.* v. *Topaz Transformer Products, Inc.,* 239 Cal.App.2d 801, 815 [49 Cal.Rptr. 209]; *Perego* v. *Seymour,* 196 Cal.App.2d 773, 778-779 [16 Cal.Rptr. 831]; *Black Point Aggregates, Inc.* v. *Niles Sand & Gravel Co.,* 188 Cal.App.2d 375, 379 [1] [10 Cal.Rptr. 761].)

Defendants admit that since the required consent of the Commissioner of Corporations was not obtained, there has been a violation of the Corporate Securities Law, but they argue that it was merely a technical violation which should not be allowed to defeat their rights. They say that decedent "could not conceivably be in the position of the class designed to be protected by the Corporate Securities Act." His estate, of course, would be in no better position than he would have been.

Plaintiff, on the other hand, contends that one of the purposes of the Corporate Securities Law is to protect parties forming corporations, as well as the shareholders generally, from the exaction of commissions by security brokers beyond those allowed by the Commissioner of Corporations and that decedent was therefore in a class designed to be protected by the law.[2]

■ Although undoubtedly the *primary* purpose of the Corporate Securities Law is to protect innocent investors (*Weinstock* v. *L. A. Carpet,*

---

[2]Section 25508 of the Corporations Code, in effect at the time of the facts giving rise to this action, provided: "The commissioner may impose conditions requiring the deposit in escrow of securities, the impoundment of the proceeds from the sale thereof, *limiting the expense in connection with the sale thereof,* the waiver of assets and dividends by the holders of promotional securities, and such other conditions as he deems reasonable and necessary or advisable for the protection of the public and the purchasers of the securities." (Italics added.)

The substance of the above section has been carried into the new Corporate Securities Law. Thus, section 25141 of the Corporations Code now provides in pertinent part: "The commissioner may impose as a condition of qualification . . . conditions requiring the deposit in escrow of securities, imposing a legend condition restricting the transferability thereof, impounding the proceeds from the sale thereof, *limiting the expense in connection with the sale thereof,* requiring the waiver of assets, dividends or voting rights by the holders of promotional securities, or any other condition if the commissioner finds that without such condition the offering will be unfair, unjust or inequitable. . . ." (Italics added.)

The purposes of the provision allowing the Corporation Commissioner to limit the broker's commission may be inferred from section 25218, subdivision (a), of the

Inc., 234 Cal.App.2d 809, 815 [5] [44 Cal.Rptr. 852]; *Crestlawn Memorial Park Assn.* v. *Sobieski,* 210 Cal.App.2d 43, 51 [9] [26 Cal.Rptr. 421]; *Hargiss* v. *Royal Air Properties, Inc.,* 206 Cal.App.2d 406, 412 [2, 3] [23 Cal.Rptr. 678]), plaintiff's contention is sound. The restriction on a broker's commission authorized by the law was clearly designed as a protection to those forming corporations, as well as the shareholders generally, against the exaction of excessive commissions by the broker. Accordingly, it appearing that the consideration for the purported transfer of the 11,000 shares by the letter agreement of November 20, 1950, constituted a selling commission in excess of that allowed by the permit, plaintiff, as decedent's successor in interest, is entitled to the protection of the Corporate Securities Law and can have the transfer set aside.

Certain cases called to our attention (e.g., *Domestic & Foreign Petroleum Co.* v. *Long,* 4 Cal.2d 547 [51 P.2d 73]) are inapplicable here, since in each a party clearly not one to be protected by the Corporate Securities Law sought to set aside a transaction as to a party who was clearly intended to be protected by the act. Such is not the situation in the present case.

■ The trial court properly found that plaintiff was not estopped to assert the claims herein made. As pointed out in *Estate of Straisinger,* 247 Cal.App.2d 574, 582 [55 Cal.Rptr. 750], " 'In general, four things are essential to the application of the doctrine of equitable estoppel: first, the party to be estopped must be apprised of the facts; second, he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; third, the other party must be ignorant of the true state of facts; and fourth, he must rely upon the conduct to his injury.' " The record shows that none of these elements existed in the present matter.

■ It should be noted, also, that, as found by the trial court, defendants Quincy Cass and Frank Foellmer, "for themselves and as agents of [QCA], used their position as officers and directors of [Eastman] to cause the issuance of Certificates 109 through 114, and to cause the issuance of the liquidating dividend to the defendants as hereinabove set forth." By such action, said defendants violated a fiduciary duty they owed to

---

Corporations Code. The provision reads in pertinent part: "No broker-dealer licensed under this chapter . . . shall effect any transaction in . . . any security in this state in contravention of such rules as the commissioner may prescribe designed to promote just and equitable principles of trade, *to provide safeguards against unreasonable profits or unreasonable rates of commissions or other charges,* and in general to protect investors and the public interest, and to remove impediments to and perfect the mechanism of a free and open market." (Italics added.) While a similar provision was not in the old Corporate Securities Law, it may be inferred that the purposes of allowing selling expense limitations were the same.

plaintiff. (*Remillard Brick Co.* v. *Remillard-Dandini,* 109 Cal.App.2d 405, 419-421 [241 P.2d 66]; cf. *Sheppard* v. *Wilcox,* 210 Cal.App.2d 53, 60 [4] [26 Cal.Rptr. 412].)

The judgment is affirmed.

Peters, Acting C. J., Tobriner, J., Mosk, J., Sullivan, J., Burke, J., and Files, J.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.