[Crim. No. 13834. Fourth Dist., Div. One. Jan. 24, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
LAWRENCE E. GRAHAM, Defendant and Appellant.

**1162**

COUNSEL

Elizabeth Meyer for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Keith I. Motley and M. Howard Wayne, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

WIENER, J.—Lawrence E. Graham appeals from the judgment entered on a jury verdict convicting him of a single count of violating the Corporate Securities Law of 1968. (Corp. Code, §§ 25000 et seq., 25540.)[1] The jury found Graham made a public offer to sell an unqualified security under section 25110.[2] Graham contends the evidence is insufficient to support the conviction. We disagree and affirm the judgment.

### Factual and Procedural Background

Robert Chapek, a modern day alchemist and Graham's codefendant at trial, wished to promote a "Midas" machine purportedly capable of extracting gold from mine water. In January 1977 Robert Krueger, a Marine Corps

---

[1] All statutory references are to the Corporations Code unless otherwise specified.

[2] Section 25110 provides in pertinent part: "It is unlawful for any person to offer or sell in this state any security in an issuer transaction . . . unless such sale has been qualified under Section 25111, 25112 or 25113 . . . or unless such security or transaction is exempted under Chapter 1 (commencing with Section 25100) of this part."

captain, invested $2,100 in an Arizona mining operation using Chapek's machine. Krueger's investment did not turn to gold. Nonetheless, with unflagging optimism, Krueger stayed in touch with Chapek. In November 1980 Chapek introduced Krueger to Graham, his partner in another venture promoting the use of the same machine. Remarkably, the machine could now detoxify chemical wastes. Chapek gave Krueger a nine-page brochure describing the machine's new capabilities and explained Graham would handle the business end of the venture while he (Chapek) provided technical expertise. Chapek and Graham suggested Krueger assist them by recruiting up to 25 investors from the San Diego military community. Graham showed Krueger a blank copy of a limited partnership agreement he could use to sell points in six of Chapek's machines, at $10,000 per point and 100 points per machine.

His suspicions aroused, Krueger did some modest research on chemical detoxification and waste disposal and then decided it would be prudent to contact the FBI. After a preliminary investigation, the FBI transferred the case to the district attorney. (See § 25533.)

Krueger reported his continuing contacts with Chapek and Graham to the district attorney's office. In addition to numerous telephone conversations with each of them, Krueger had two business meetings with Graham and then visited Chapek's and Graham's office and warehouse facility in March 1981 to inspect Chapek's chemical detoxification machine. Krueger recognized the machine as the same one he had previously invested in. Chapek gave Krueger a detailed explanation of the machine's detoxification operation so he could repeat the information to prospective investors. Graham gave Krueger an "operating copy" of the venture's limited partnership agreement with Krueger's name filled in as a general partner.

After the meeting to inspect Chapek's multifarious and versatile machine Krueger met Graham several times for lunch to plan a presentation to a prospective investor. Pursuant to those plans, Chapek, Graham and Krueger met with Harry Grady on March 18, 1981. Grady, an investigator for the district attorney's office, played the part of the interested investor and surreptitiously taped the entire meeting. During the course of the meeting Graham gave Grady a copy of Chapek's brochure about his chemical detoxification machine and showed Grady a copy of the limited partnership agreement to which his name would be added as a limited partner. Chapek and Graham also presented descriptions of the technical and business aspects of their venture. Grady repeatedly expressed interest in their venture and suggested he begin with a $10,000 investment. He also mentioned he thought some of his retired military friends might be interested in investing. Chapek and Graham each suggested Grady could promote their venture among his

friends. They parted with plans to meet again in two days, when Grady would deliver a $10,000 cashier's check payable to Graham and Graham would detail Grady's role in promoting Chapek's machine. At their next meeting, instead of delivering the money, Grady delivered Graham to another district attorney investigator who arrested him.

### Discussion

█ Section 25110 is designed to prevent the offer for sale or sale of unqualified securities. (See *ante,* fn. 2.) Former section 25102, subdivision (f) provided an exemption from section 25110 if the offer to sell certain types of unqualified securities was not a "public" offer. It was not disputed at trial that Graham and Chapek made no attempt to qualify the limited partnership interest they offered to sell to Harry Grady. Graham contends on this appeal, however, that the partnership interest was not a "security" within the meaning of section 25110 because the anticipated return on Grady's investment involved his personal participation in the venture. Graham also argues that the offer to Grady was not "public" within the meaning of former section 25102, subdivision (f), and was thus exempt.

### I

It must first be determined that a defendant offered to sell a "security" before liability under section 25110 can attach. █ Section 25019 defines a "security" by illustrative example rather than attempting to set out an all-inclusive formula.[3] (See *People* v. *Syde* (1951) 37 Cal.2d 765, 768 [235 P.2d 601].) Nonetheless, it is clear the Legislature intended that the term have a broad scope "to protect the public against spurious schemes, however ingeniously devised, to attract risk capital." (*Silver Hills Country Club* v. *Sobieski* (1961) 55 Cal.2d 811, 814 [13 Cal.Rptr. 186, 361 P.2d 906, 87 A.L.R.2d 1135].)

Both the People and Graham agree that Graham offered to sell Grady a limited partnership interest in the venture. █ Although limited partner-

---

[3]Section 25019 provides in relevant part as follows: "'Security' means any note; stock; treasury stock; membership in an incorporated or unincorporated association; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profitsharing agreement; collateral trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas or mining title or lease or in payments out of production under such a title or lease; any beneficial interest or other security issued in connection with a funded employees' pension, profit sharing, stock bonus, or similar benefit plan; or, in general, any interest or instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. All of the foregoing are securities whether or not evidenced by a written document."

ship interests are not mentioned in section 25019, they may nonetheless constitute securities under appropriate circumstances. (See, e.g., *People* v. *Woodson* (1947) 78 Cal.App.2d 132, 135-136 [177 P.2d 586]; see also Comment, *Limited Partnerships and the California Securities Law: Restricting the Public Sale of Limited Partnership Interests* (1980) 13 U.C.Davis L.Rev. 618, 619-630 [hereafter *Public Sale Comment*].) The question is what are appropriate circumstances.[4]

Considerable scholarly debate has ensued on the proper definition of a "security." In *Securities and Exchange Com'n* v. *W. J. Howey Co.* (1946) 328 U.S. 293, 298-299 [90 L.Ed. 1244, 1249, 66 S.Ct. 1100, 163 A.L.R. 1043], the United States Supreme Court suggested the following definition: "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . ."[5] The final prong of the *Howey* test, requiring that profits be derived "solely" from the efforts of others, has proved to be a troublesome one. Some courts have interpreted the requirement quite literally, holding that any investor participation, whether or not of a managerial nature, is sufficient to take the transaction out of the "security" category. (See, e.g., *Bruner* v. *State* (Tex.Crim. 1970) 463 S.W.2d 205, 215; *Gallion* v. *Alabama Market Centers, Inc.* (1968) 282 Ala. 679 [213 So.2d 841, 845-846;[6] see also *California and Federal Definitions, op. cit. supra,* 16 Santa Clara L.Rev. at pp. 330-331.) In *Securities & Exchange Com'n* v. *Glenn W. Turner Ent., Inc.* (9th Cir. 1973) 474 F.2d 476, 482, the Ninth Circuit proffered a more liberal construction: "Strict interpretation of the requirement that profits to be earned must come 'solely' from the efforts of others has been subject to criticism. See, *e.g., State of Hawaii* v. *Hawaii Market Center* (Hawaii 1971) 485 P.2d 105. Adherence to such an interpretation could result in a mechanical, unduly restrictive view of

---

[4]Courts generally have focused on the nebulous "investment contract" concept, which is specifically listed in section 25019, and analyze whether a given limited partnership agreement constitutes an investment contract and therefore a "security." (See, e.g., *McGreghar Land Company* v. *Meguiar* (9th Cir. 1975) 521 F.2d 822, 824; *Kroungold* v. *Triester* (E.D.Pa. 1975) 407 F.Supp. 414, 417.) Commentators have appropriately noted that the term "investment contract" is so broad as to give little more guidance than the term "security." (See Comment, *Is a Limited Partnership a "Security"?: The Current State of the California and Federal Definitions Add a Legal Dimension to Economic Speculation* (1976) 16 Santa Clara L.Rev. 311, 316 [hereafter *California and Federal Definitions*].) Assuming one accepts the proposition that the listing in section 25019 is not exclusive (see *ante,* p. 1164), it would seem equally correct and less confusing to simply analyze whether a given limited partnership interest is a "security." (*Id.,* at p. 316, fn. 32.)

[5]*Howey* involved an interpretation of section 2(1) of the Securities Act of 1933 (15 U.S.C. § 77b(1)), another illustrate-by-example definition of the term "security" which is substantially identical to that appearing in section 25019.

[6]Significantly, the Alabama Supreme Court recently overruled *Gallion* and adopted a considerably more liberal view of the "efforts of others" requirement. (See *Burke* v. *State* (Ala. 1980) 385 So.2d 648, 651-652.)

what is and what is not an investment contract. It would be easy to evade by adding a requirement that the buyer contribute a modicum of effort. . . . Rather we adopt a more realistic test, whether the efforts made by those other than the investor are the undeniably significant ones, *those essential managerial efforts which affect the failure or success of the enterprise.*" (Fn. omitted, italics added.) (See also *Securities & Exch. Com.* v. *Koscot Inter., Inc.* (5th Cir. 1974) 497 F.2d 473, 479-484.)[7]

Relying on an unmodified *Howey,* Graham argues for a strict interpretation of the "solely" requirement. He points to evidence in the record suggesting that Graham and Chapek anticipated that Grady would actively participate in recruiting investors for the venture.[8] The People, on the other hand, contend that *Howey* as interpreted in *Glenn Turner* allows for such investor participation because it does not constitute "essential managerial efforts."

Both parties ignore the fact that the *Howey* test, whether modified or not, may well not be the means by which a "security" is defined in California. Since the California Supreme Court's decision in *Silver Hills Country Club* v. *Sobieski, supra,* 55 Cal.2d 811, California courts have generally applied

---

[7]Arguably, the U.S. Supreme Court has acquiesced in the *Glenn Turner* modification: "The touchstone [of the *Howey* test] is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the *entrepreneurial or managerial* efforts of others." (*United Housing Foundation, Inc.* v. *Forman* (1975) 421 U.S. 837, 852 [44 L.Ed.2d 621, 632, 95 S.Ct. 2051] (italics added).)

[8]Graham relies on statements like the following from the March 18 meeting with Grady to indicate that something more than Grady's money was being solicited:

"Grady: Looks like you guys got more than you can handle, you need help, you need seed money. Isn't that what they call it?

"Graham: We need help, that's right, we need money and we need help.

"Grady: Boy I'm interested.

" . . . . . . . . . . . . . . . . . .

"Graham: We have a big world that's ready to explode on us and you know, we really need, not only financial help, we need some help with people to come in and help us with what we're doing.

"Chapek: Absolutely.

"Grady: Hell, well I'm interested. How do I go about this?

"Chapek: That's up to you. You know (unintelligible) time to work with us? I know maybe you've got all of your time planned.

"Grady: Sure, no I don't have. I have time on my hands.

" . . . . . . . . . . . . . . . . . . .

"Graham: We really need some help, more than we need money, we need help, we need bucks, too.

"Chapek: Yeah, I was going to say even if you didn't have any money, we'd love to have you come in because

"Grady: I love to come in, I'd like to try anything new . . . ."

what is known as the "risk capital" test.[9] (See *Hamilton Jewelers* v. *Department of Corporations* (1974) 37 Cal.App.3d 330, 335 [112 Cal.Rptr. 387]; see also *California and Federal Definitions, op. cit. supra,* 16 Santa Clara L.Rev. at p. 324.) That test recognizes that the purposes of Corporate Securities Law regulation are implicated whenever investors provide capital which will be risked in the promoter's venture or enterprise. (*Silver Hills, supra,* 55 Cal.2d at p. 815; see also *Hamilton Jewelers, supra,* 37 Cal.App.3d at pp. 334-335.)

*Silver Hills* involved an offer to sell memberships in a country club, the proceeds from which were to be used to finance the construction and improvement of the club. Upon payment of monthly dues, members became entitled to use all of the club's facilities. The crucial issue was whether the lack of an entitlement to share in the profits of the club meant that the memberships were not "securities." Answering in the negative, the Supreme Court explained that the key element was the fact that the membership revenues served to provide risk capital for the club venture. (55 Cal.2d at p. 815.)

Because of the context in which it arose, *Silver Hills* did not concern itself with whether the *risk* of business *capital* were the only considerations in determining if an investment was a "security." As one commentator has explained, however, "California courts that have used the risk capital test have also looked for other key elements . . . ." (*California and Federal Definitions, op. cit. supra,* 16 Santa Clara L.Rev. at p. 321.) And other states adopting the risk capital formulation have included additional elements. (See *State, Com'r of Securities* v. *Hawaii Market Ctr., Inc.* (1971) 52 Hawaii 642 [485 P.2d 105, 109, 47 A.L.R.3d 1366];[10] Alaska Stat. (1962) § 45.55.130(12).[11]

We do not read *Silver Hills* as holding that certain other elements ought not to be considered in determining whether the investment constitutes a

---

[9]The parties' confusion may stem from the relatively recent decision in *People* v. *Park* (1978) 87 Cal.App.3d 550 [151 Cal.Rptr. 146], which they both cite and discuss. In attempting to define an investment contract (see *ante,* fn. 4), *Park* relied on the *Howey* standard. The *Silver Hills* risk capital analysis is not acknowledged. The court also quoted the district court opinion in *Glenn Turner* rather than the Ninth Circuit decision. (87 Cal.App.3d at p. 563; see generally *Public Sale Comment, op. cit. supra,* 13 U.C.Davis L.Rev. at pp. 627-628.)

[10]In *Hawaii Market Center,* the Hawaii Supreme Court relied on *Silver Hills* and explained that the "subjection of the investor's money to the risk of an enterprise over which he exercises no managerial control is the basic economic reality of a security transaction." (485 P.2d at p. 109.)

[11]Under the Alaska statute, the definition of a security includes an "investment of money or money's worth including goods furnished or services performed in the risk capital of a venture with the expectation of some benefit to the investor where the investor has no direct control over the investment or policy of the venture."

"security" within the meaning of section 25019. In particular, we believe the requirement that the investor not exercise managerial control over the enterprise is "implicit in the risk capital test as derived from [*Silver Hills*]." (*Securities and Exch. Com.* v. *Koscot Inter., Inc., supra,* 497 F.2d at p. 477, fn. 7; see also Deacon & Prendergast, *Defining a "Security" After the Forman Decision* (1980) 11 Pacific L.J. 213, 221.) In that sense, our conclusion has the effect of merging elements of both the *Howey* test and the risk capital test.[12] See *California and Federal Definitions, op. cit. supra,* 16 Santa Clara L.Rev. at pp. 332-333; *Public Sale Comment, op. cit. supra,* 13 U.C.Davis L.Rev. at p. 628, fn. 50; Long, *Partnership, Limited Partnership, and Joint Venture Interests as Securities* (1972) 37 Mo.L.Rev. 581, 604-605.) We also agree with the Ninth Circuit, as expressed in *Glenn Turner,* that the broad remedial purposes of the Corporate Securities Law (see *Silver Hills, supra,* 55 Cal.2d at p. 814) require that the "no control" element have a correspondingly broad definition. Otherwise, the element "would be easy [for the promoter] to evade by adding a requirement that the [investor] contribute a modicum of effort." (*Glenn Turner, supra,* 474 F.2d at p. 482.) Thus, under California law, an investment may constitute a security notwithstanding that investor participation is contemplated or required as long as the investor is not involved in "those essential managerial efforts which affect the failure or success of the enterprise." (*Ibid.*)

In the present case, Grady's contemplated participation, at most, would have been limited to recruiting additional investors. His repeated disclaimers of understanding the operational or technical aspects of the business belie any other suggestion. There is no question but that the "essential managerial efforts" in this venture were to have been Graham's, Chapek's and perhaps Krueger's.

We also note that whatever the exact confines of "essential managerial efforts" may be as to other types of investments, the issue in the context of a limited partnership interest is an easy one to resolve. Under section 15507, a limited partner cannot maintain his limited status and at the same time exercise managerial control over the partnership. Thus, assuming that what is being offered for sale is a *limited* partnership interest,[13] we do not see

---

[12]Because we have concluded that both the *Howey* test and the risk capital analysis include a "no control" requirement, we need not decide whether the *Silver Hills* risk capital analysis is the exclusive definition of a security in California or whether, as some courts and commentators have suggested, the *Howey* and *Silver Hills* tests are complementary and alternative. (See *State* ex rel. *Healy* v. *Consumer Business System, Inc.* (1971) 5 Ore.App. 294 [482 P.2d 549, 554]; Deacon & Prendergast, *supra,* at p. 222.) See *California and Federal Definitions, op. cit. supra,* 16 Santa Clara L.Rev. at p. 332; *Public Sale Comment, op. cit. supra,* 13 U.C.Davis L.Rev. at p. 628, fn. 50.)

[13]As we earlier noted Graham concedes he offered to sell a limited partnership interest to Grady. (See *ante,* p. 1166.)

how the "no control" requirement could be violated. (See Long, *op. cit. supra,* 37 Mo.L.Rev. at p. 612.)

Accordingly, we conclude that the limited partnership interest which Graham offered to sell to Grady was a security within the meaning of section 25019.

## II

■ ■■■ It remains to be determined whether substantial evidence supports the jury's determination that Graham's offer to sell a limited partnership interest to Grady was a "public" offer,[14] and therefore not exempt under former section 25102, subdivision (f) from the qualification require-

---

[14]Our phrasing of the jury's finding in our opening paragraph and our statement of the issue immediately above deserve explanation.

Section 25110 by its terms does not limit its regulatory scope only to *public* offerings of securities in issuer transactions. (See fn. 2, *ante.*) Instead, that section purports to regulate all offerings, whether public or nonpublic, *unless* certain exemptions apply. One such exemption is the nonpublic transaction exemption provided by former section 25102, subdivision (f). Consequently, the public/nonpublic aspect of an offering may become relevant depending on the facts of a particular case. Because the defendant is in a better position to know the relevant facts, section 25163 places the burden of proving the nonpublic transaction exemption on the person claiming it. (See *People* v. *Park, supra,* 87 Cal.App.3d at pp. 566-567; see generally 9 Wigmore, Evidence (Chadbourn rev. ed. 1981) § 2486, p. 290.) The nonpublic transaction exemption thus operates as an affirmative defense which, if proved, relieves a defendant of criminal liability under section 25110 by excluding nonpublic offers or sales of certain securities from that section's regulatory scope. (See *People* v. *Skelton* (1980) 109 Cal.App.3d 691, 724 [167 Cal.Rptr. 636], cert. den., 450 U.S. 917 [67 L.Ed.2d 343, 101 S.Ct. 1361]; *People* v. *Park, supra,* 87 Cal.App.3d at pp. 566-567.)

Having said all this we nonetheless have deliberately phrased the jury's finding as though the public aspect of Graham's offer to Grady was an element of the section 25110 offense with which he was charged. We have done so because that phrasing mirrors the theory on which this case was tried. The court never instructed on anything other than the People's burden of proving their case beyond a reasonable doubt. The jury was not told that the nonpublic offering exemption constituted an affirmative defense. While the prosecutor in argument mentioned the concept of an affirmative defense as it applied to the exemption, he then explained he was assuming the burden of "disprov[ing] something that [the defendants] are burdened with proving." Explaining why he was assuming such a burden, the prosecutor stated, ". . . because I will tell you in this system I always have the burden of proving it beyond a reasonable doubt; everything." The defense explicitly argued that the burden of proof on the exemption never shifted to the defendants. The prosecutor did not take issue with defense counsel's statements in his closing argument. Under these circumstances, the jury's conviction of Graham necessarily indicates it found he made a public offer to sell an unqualified security under section 25110.

The parties and the court apparently approached the public/nonpublic issue in the manner described above because that approach was consistent with the court's treatment of the same public/nonpublic issue under section 25102, subdivision (e) in *People* v. *Humphreys* (1970) 4 Cal.App.3d 693, 697 [84 Cal.Rptr. 496]. Even if erroneous, the analytical approach described above was harmless because Graham received the benefit of being relieved of a burden and was nonetheless convicted.

ments of section 25110.[15] ▮▮▮ Pursuant to section 25610, the Commissioner of Corporations promulgated former rule 260.102.2 defining the types of transactions which would fall within the scope of former section 25102, subdivision (f). That rule created a "safe harbor" for the entrepreneurial issuer, establishing a conclusive presumption that offers to sell limited partnership interests are not "public offerings" within the meaning of former section 25102, subdivision (f) when offers are not made to more than 25 persons and sales are not consummated to more than 10 of such persons, *and* when all the offerees *either* have a preexisting personal or business relationship with the offeror or related persons *or* by reason of their business or financial experience could be reasonably assumed to have the capacity to protect their own interests in connection with the transaction.[16] (See 1 Marsh & Volk, *supra,* § 4.02A[1][b].)

From a business perspective, former rule 260.102.2 had the salutary effect of creating firm guidelines informing persons attempting to raise venture capital of the lawful parameters within which they could work. As a byproduct of the rule, a defendant in a criminal case brought under the Corporate Securities Law was given an absolute defense. A defendant charged with violating section 25110 could gain acquittal via former section 25102, subdivision (f) by establishing the transaction at issue complied with

---

[15]Former section 25102 provided in part:

"The following transactions are exempted from the provisions of Section 25110:

" . . . . . . . . . . . . . . . . . . . .

"(f) Any offer or sale, *in a transaction not involving any public offering,* of any bona fide general partnership, joint venture or limited partnership interest, or any beneficial interest in a trust which is a 'security' within the meaning of Section 25019, if in the case of such beneficial trust interests immediately after the sale and issuance they are owned by no more than five persons." (Stats. 1980, ch. 579, § 3, pp. 1583-1584, italics added.)

Effective November 1, 1981, section 25102, subdivision (f) provides a limited offering exemption for the offer or sale of any security in transactions meeting specified statutory criteria. (Stats. 1981, ch. 1120, § 1, pp. 4388-4389; 1 Marsh & Volk, Practice Under the Cal. Securities Laws (rev. ed. 1983) § 4.02A[1][a] (cited hereafter as Marsh & Volk).)

[16]All rule references are to the rules of the Commissioner of Corporations as published in title 10 of the California Administrative Code. Former rule 260.102.2 provided: "For the purposes of Subdivisions (e) and (g) of Section 25102 and Subdivision (a) of Section 25104 of the Code, an offer or sale, and for the purposes of Subdivision (f) of Section 25102, *an offer or sale* of any bona fide general partnership, joint venture or limited partnership interest, *does not involve any public offering if offers are not made to more than 25 persons and sales are not consummated to more than 10 of such persons, and if all of the offerees either have a preexisting personal or business relationship with the offeror or its partners, officers, directors or controlling persons or by reason of their business or financial experience could be reasonably assumed to have the capacity to protect their own interests in connection with the transaction.* The number of offerees and purchasers referred to above is exclusive of any described in subdivision (i) of Section 25102 of the Code and a husband and wife (together with any custodian or trustee acting for the account of their minor children) are counted as one person. This section does not create any presumption that a public offering is involved in offers not conforming to this section, and the determination of whether or not a transaction not covered by this section involves a public offering shall be made without reference to this section." (Italics added.)

the quantitative restrictions of former rule 260.102.2 and satisfied either one of the rule's two qualitative requirements.

Graham contends because there were no sales of limited partnership interests and only one offer—to Grady—that the quantitative requirements of the rule are clearly satisfied.[17] He further argues that both of the qualitative requirements are met because Grady was portrayed as having a preexisting relationship with Krueger and because the facts revealed in the March 18 meeting between Grady and Graham showed Grady to be an experienced and sophisticated investor.

The "preexisting relationship" test under former rule 260.102.2 requires the nature and duration of the offeree's personal or business relationship with the offeror or related persons to be "such as would enable a reasonably prudent purchaser to be aware of the character, business acumen and general business and financial circumstances of the person with whom such relationship exists." (Rule 260.102.12, subd. (d); see 1 Marsh & Volk, *supra*, § 4.02A[2][c][ii], p. 4-28.5, fn. 17 and accompanying text.) The "sophisticated investor" test, on the other hand, "focuses on the purchaser's ability to evaluate the risks of purchasing the securities offered." (1 Marsh & Volk, *supra*, § 4.02A[2][c][iii], p. 4-28.6.) The test seeks to identify those purchasers "that have the type of business or financial experience which should put them in a separate category from the gullible members of the general public, whom the statute is primarily designed to protect . . . ." (*Id.,* at § 4.05[2], p. 4-36.) Taken together, the purpose of the rule's two qualitative requirements is "to separate those private, negotiated transactions between persons who should be able to 'fend for themselves' (in the language of the United States Supreme Court) from an offering at

---

[17]We admit to some considerable concern with Graham's quantitative argument in terms of the underlying purpose of the qualification statute. The facts demonstrate that Graham contemplated offering 600 investment "points" at $10,000 per point for a total investment of $6 million. (See *ante,* p. 1163.) Although, as Graham points out, it would be mathematically possible to obtain such investment funds by making less than 25 offers or fewer than 10 sales of partnership interests if each investor purchased large numbers of "points," it is extremely unlikely, especially given the fact that Grady was offered a single "point." Furthermore, the targeted investment group—military or retired military personnel—belies any suggestion that Graham planned a limited nonpublic offering to a few very wealthy individuals. Graham in fact specifically suggested that Krueger recruit 25 investors from the San Diego military community. Under the circumstances, it is largely fortuitous that Graham was arrested before having been able to make more than 25 offers.

The issue is thus whether the words "offers" and "sales" in former rule 260.102.2 refer to actual offers and sales or contemplated offers and sales. Because of our conclusion that substantial evidence supports the jury's determination that neither of the qualitative requirements of the rule are satisfied, we need not decide this difficult interpretive question. We note, however, that our view that Graham did not contemplate a limited nonpublic offering supports our later conclusion that notwithstanding rule 260.102.2, Graham did not establish his entitlement to the nonpublic exemption.

random to the general public without regard to any relationship to the offeror or the ability of the offeree to evaluate the risk in the transaction for himself." (*Id.,* at § 4.05[2], pp. 4-36 to 4-36.1, fn. omitted; accord *People v. Park, supra,* 87 Cal.App.3d at p. 565.)

██ In one sense, Graham's transaction with Grady clearly satisfied *both* qualitative requirements under former rule 260.102.2. As an undercover investigator participating in a "sting" operation, Grady was thoroughly familiar with the character and business background of Chapek and Graham and unquestionably was able to "fend for himself" in connection with their venture. Marsh and Volk, however, suggest the preexisting relationship test should be applied using an objective rather than a subjective standard. (1 Marsh & Volk, *supra,* § 4.02A[2][c][ii], p. 4-28.5.) They also intimate the sophisticated investor test should be applied from the issuer's rather than the offeree's point of view. (See *id.,* § 4.02A[2][c][iii], p. 4-28.6, text at fn. 20.) Using the issuer's perspective makes sense for two reasons. First, that approach is more consistent with the language of former rule 260.102.2 which requires that "all of the offerees . . . by reason of their business or financial experience *could be reasonably assumed* to have the capacity to protect their own interests in connection with the transaction." (See fn. 16, *ante,* italics added.) Second, that approach also is more consistent with the statutory purpose of protecting the gullible investor (1 Marsh & Volk, *supra,* § 4.05[2], p. 4-36; accord, *Southern Cal. First Nat. Bank* v. *Quincy Cass Associates* (1970) 3 Cal.3d 667, 675-676 [91 Cal.Rptr. 605, 478 P.2d 37]; *Craft* v. *Brooks* (1962) 204 Cal.App.2d 187, 188-189 [22 Cal.Rptr. 68]) because it places on the issuer the burden of establishing his offerees' abilities to "fend for themselves" as a condition for exemption from the regulatory provisions that would otherwise apply. (See §§ 25110, 25163.) Thus a conscientious issuer will avoid soliciting unsophisticated prospective investors, thereby extending to them the statutory protections which they might inadvertently shun if left to self-assessments of their business and financial expertise.

Graham does not contest that Grady had no preexisting relationship with either Chapek or Graham. He asserts, however, that Grady was portrayed as having a sufficiently close preexisting relationship with Krueger to satisfy the test. Krueger's nebulous and relatively insignificant role in the venture—largely that of a glorified investor—was such that the jury could reasonably conclude that whatever Grady's relationship with Krueger, it was insufficient to allow him any insight into the "character, business acumen and general business and financial circumstances" of the persons who would control and manage the venture, namely Graham and Chapek.

While the issue of Grady's sophistication poses perhaps a closer question, it too was for the jury to resolve. Graham relies on statements made by

Grady in their March 18 meeting indicating that Grady was a successful and experienced real estate investor.[18] Grady was careful to point out, however, that he was "a real common person" lacking in financial sophistication. ("What I like about [real estate investing] is you don't have to be very smart to do it.") He repeatedly disclaimed any understanding of the machine or Graham's venture. ("I'm a real estate guy so I don't know a damn thing about this.") It was for the jury, having heard all the evidence of the circumstances surrounding the transaction, to determine which of several conflicting inferences to draw from the facts. On this record, we are in no position to disturb the jury's finding on the question of Grady's sophistication.[19] (See generally, *Tennant* v. *Peoria & P.U. Ry. Co.* (1944) 321 U.S. 29, 35 [88 L.Ed. 520].)

---

[18]After initial pleasantries, the following exchange occurred:

"KRUEGER: I was talking to Harry this morning, telling him more about you know, what was going on (unintelligible) project and everything. Again, I'll let you guys explain that now.

"GRADY: I'm a real estate guy so I don't know a damn thing about this.

"GRAHAM: How'd you get in real estate, being

"GRADY: I started pyramiding.

"GRAHAM: Buying houses and

"GRADY: Apartment houses, trading up, trading up

"CHAPEK: Farm houses, yeh, and I trade others.

"GRAHAM: Ok. I had a real estate company back in '71. I was involved in land. I caught in right on the, you know, it was going up.

"GRADY: It was going up. You got out in time?

"GRAHAM: Yeh and I, well in '73 I sold my land company and went into drilling oil wells back in Texas.

"GRADY: For God's sake.

"GRAHAM: And it got me into the oil business and that begot me the mining business and begot me the IRS

"GRADY: Yeh, you'll always attract attention easy enough. (Laughter.)

"GRAHAM: I really love real estate. I have a license too, but I, I love real estate, it was a lot of fun and made, made some pretty good money.

"GRADY: That's a damn good way of making money and you don't

"GRAHAM: It's safe.

"GRADY: What I like about it is you don't have to be very smart to do it.

"GRAHAM: Yeh, right. That's right. You don't have to be smart, you can make a lot of mistakes and still win.

"GRADY: Still win, I'm with you.

"CHAPEK: Yeh.

"KRUEGER: Harry's retired Navy. I was wondering where you got the Marines, I was wondering where you got the Navy

"GRADY: I'll go that if you want me to, but

"GRAHAM: That's all right. We don't want to convert you.

"CHAPEK: It's all part of the same

"GRADY: I'm a boatswain type, a real common person

"GRAHAM: Well, we just, I disqualify for our group. (Laughter.)

"KRUEGER: Well, it's been big.

"GRADY: Well, I'm interested in investing. Hell, I've, you know, it's a dead market now, interest the way it is there's nothing you can do. I'm in a total. I'm interested in anything where I can make a little money. I'm sure dead in the water in real estate though."

[19]Graham makes no challenge to the manner in which the jury was instructed on this issue.

Relying on the last sentence of former rule 260.102.2 (see *ante,* fn. 16), Graham also argues that the limited partnership offering was nonpublic notwithstanding that it might not meet all of the rule's specific requirements. As we have noted, however, the planned size of the offering and the nature of the investors to whom it was to be directed militate against our holding that the offering was exempt as a matter of law. (*Ante,* fn. 17.) Moreover, any such determination must be made with reference to the underlying purpose of the qualification requirement, which is to protect potential investors from speculative fraudulent and deceptive investment schemes. (See *Eberhard* v. *Pacific Southwest L. & M. Corp.* (1932) 215 Cal. 226, 228 [9 P.2d 302]; *People* v. *Hoshor* (1949) 92 Cal.App.2d 250, 256 [206 P.2d 882].) The jury here reasonably concluded that neither Grady's past investment experience nor his knowledge of the present scheme and its promoters were sufficient to eliminate his need for statutory protection.

### Disposition

The judgment is affirmed.

Staniforth, Acting P. J., and Work, J., concurred.