Filed 3/30/15  Rockroller v. Koljonen CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ROCKROLLER, LLC, | D062504 |
| Plaintiff and Respondent and Cross-Appellant, | |
| v. | (Super. Ct. No. 37-2008-00097061-CU-NP-CTL) |
| ALLAN KOLJONEN, et al., | |
| Defendants and Appellants and Cross-Respondents. | |

APPEALS from a judgment of the Superior Court of San Diego County, Ronald Styn, Judge.  Affirmed in part; reversed in part with directions.

Joel P. Schiff for Plaintiff and Respondent and Cross-Appellant.

Boudreau Williams for Defendants and Appellants and Cross-Respondents.

This is a conversion action by Rockroller, LLC (Rockroller), in which Allan Koljonen, Constance Chandler Englert, Tom Pancheri, Vince Severino, and Gerald P. LaFlamme (collectively, the Investor Group or Investor Group members) appeal a judgment entered against each of them for $50,000 after a jury trial.[1] The Investor Group members contend the trial court erred by allowing the jury to determine whether ownership interests they purchased in Rockroller were exempt from qualification under Corporations Code[2] section 25102, subdivision (f), as the issue was a legal one for the court, and by excluding their expert's testimony on the issue after allowing Rockroller's attorney to testify. The Investor Group also challenges the sufficiency of the evidence to support the exemption and conversion findings.

Rockroller also appeals, contending the court erred by denying its request to enter a judgment imposing joint and several liability on each of the Investor Group members based on a conspiracy theory. Further, Rockroller contends the court erred by denying its request for prejudgment interest.

We conclude the Investor Group's appeal lacks merit, as does Rockroller's appeal insofar as it pertains to joint and several liability. We agree the court erred by denying

---

[1]    Jerry Englert and Gerald T. LaFlamme were Investor Group members, but they died during the pendency of this appeal. Constance Chandler Englert has been substituted in her husband's place as a successor trustee of a family trust, and Gerald P. LaFlamme has been substituted in his father's place as a successor trustee of a family trust. When we refer to Englert or LaFlamme individually, we mean Jerry Englert and Gerald T. LaFlamme.

[2]    Future undesignated statutory references are to the Corporations Code.

2

Rockroller's request for prejudgment interest.  Accordingly, we affirm the judgment in part and reverse it in part with directions.

## FACTUAL AND PROCEDURAL BACKGROUND

Rockroller was formed in 2004 by Bradley Adams and Jim Flood to develop and sell golf training aids.  Its "Series A" investors were Adams, whose role was business operations oversight; Flood, whose role was product development; and Bion Wilcox, a silent investor.  Adams contributed $1,000, Bion contributed $40,000, and Flood contributed his rights to a putting device he invented called the Rockroller.

Rockroller hired Ernie Els to promote the Rockroller.  In early 2005, to pay for an infomercial with Els, Rockroller raised approximately $500,000 through a "Series B" offering, in which about 20 investors paid $25,000 each for a one percent interest in the company.  The infomercial ran in April or May 2005, and the results were "marginal."

In the summer of 2005, Rockroller hired W. Charles Pullen, an advertiser, to head marketing in exchange for a fee and "five percent stake in the company for two years' worth of work."  Pullen and Flood knew each other from living in Del Mar, and Pullen was one of the investors in Series B.

In the fall of 2005, Pullen's duties expanded.  Rockroller's financial records were in disarray and Adams wanted to concentrate on recruiting tour golfers to use the Rockroller.  Rockroller provided Pullen with its business records and checkbooks and made him a signatory on its accounts and "responsible for . . . all the day-to-day

3

business" and "corporate compliance." Rockroller presented Pullen to potential investors as a director and chief operating officer.

Rockroller also decided to raise additional funds, primarily to update the infomercial to include new products. Rockroller issued a "Series C" offering to sell one percent interests in the business for $50,000, in the hope of raising a minimum of $500,000 and a maximum of $1,000,000.[3] At the time, Rockroller had purchased approximately $220,000 in inventory, and it had a retail value of between $700,000 and $750,000. The inventory was stored in a third party's warehouse.

In the spring of 2006, the Investor Group members, and Pullen, each invested $50,000 in Series C.[4] In doing so, the members dealt exclusively with Pullen, who had full authority to negotiate on Rockroller's behalf. The Investor Group members were also from Del Mar, and at least some of them and Pullen were acquainted. Pullen described LaFlamme as his best friend. The Investor Group insisted that Pullen invest in Series C so he would have "skin in the game."

It is undisputed that the Investor Group's investments were contingent on Rockroller raising a threshold amount on Series C. According to Pullen and the Investor

---

[3]     The Series A and Series B ownership interests already exceeded 100 percent. To solve the problem, the interests of the three Series A investors, Adams, Flood, and Wilcox, were diluted by the interests of the Series B and C investors.

[4]     Some of the investments were through family trusts.

Group members, the threshold amount was $1,000,000.[5] According to Rockroller, the threshold amount was $500,000. Pullen deposited the funds into Rockroller's money market account and agreed to return them if the threshold was not met.

In June 2006, Pullen discovered that approximately one-half of Rockroller's inventory was missing from the warehouse, an uninsured loss. What remained was "remnants of the full product line" from which Rockroller could not fill existing orders. Rockroller had by then raised $625,000 on Series C from 12 investors and, given the inventory loss, Pullen could not solicit additional funds.

Pullen told Adams he wanted to return the Investor Group's money because of the missing inventory. Pullen also claimed the Series C threshold was unmet. According to Pullen, Adams gave him permission to return the money and Flood deferred to Adams.[6] According to Adams, he disagreed that the threshold amount was unmet, but he did not explicitly forbid Pullen from returning the money. Flood confirmed that he deferred to Adams.

On June 30, 2006, Pullen obtained five $50,000 cashier checks from Rockroller's account and delivered them to the Investor Group members. In July and August 2006,

---

[5] Pullen acknowledged signing a declaration that stated the threshold amount was $800,000, but that is immaterial as the outcome is the same regardless of whether it was $800,000 or $1,000,000. Because Pullen testified to the $1,000,000 amount, we use it here.

[6] In response to an interrogatory, however, Pullen stated Flood gave him permission. He did not mention Adams.

5

Pullen wrote checks to himself totaling $85,000, for a total withdrawal of $335,000. Pullen resigned from the company and it became defunct.

In December 2008, Rockroller sued Pullen and the Investor Group members. The first amended complaint included a cause of action against Pullen for breach of fiduciary duty and a cause of action against all defendants for conversion. As to the conversion claim, Rockroller argued defendants were guilty of conspiracy.

Trial was held in July 2011. The Investor Group members argued they were legally entitled to the return of their funds because Rockroller violated the Corporations Code by selling unregistered securities. Rockroller countered that the Series C offering was exempt from registration under the private securities exception set forth in section 25102, subdivision (f).

The jury was instructed that Rockroller was claiming prejudgment interest on any damages awarded. The jury was presented with separate special verdicts on conversion, conspiracy, breach of fiduciary duty, and affirmative defenses. None of the verdicts mentioned prejudgment interest. During deliberations, Rockroller advised the court of the omission, and asked, "Are you going to take over that function?" The court responded, "That would be fine," and, "I can do that post-trial."

The jury found Rockroller was the rightful owner of the $335,000 in dispute, the defendants intentionally took possession of Rockroller's money without its consent, Rockroller's damages were $335,000, and each of the Investment Group members "agree[d] to take possession of the $50,000.00 he received from . . . Pullen." Defendants'

6

conduct, however, was not malicious, oppressive, or fraudulent. The jury found Pullen was a fiduciary of Rockroller, and he breached his fiduciary duty.

The jury also found the Investor Group members delivered their funds conditionally, the condition was communicated to Rockroller, and it satisfied the condition. Further, the jury found the Series C transactions were exempt from securities law.

Further, the jury determined Pullen and the Investor Group members were guilty of conspiracy. On the conspiracy, the jury determined Pullen caused $85,000 in damages and each of the Investor Group members caused $50,000 in damages.

In September 2011, the court ruled in Rockroller's favor on defendants' equitable defenses. In November 2011, the court rejected Rockroller's first proposed judgment, which included prejudgment interest and imposed joint and several liability on each of the Investor Group members for the full $335,000 in damages. The court's minute order states the proposed judgment "is inconsistent with the jury verdict" because "[o]nly . . . Pullen is liable for the $335,000." The court directed Rockroller to "correct and re-submit."

In December 2011, Rockroller presented a second proposed judgment, which included prejudgment interest. It stated Pullen was liable for $335,000 in damages and each of the Investment Group members was liable for $50,000 in damages. The court rejected the submission "for format issues, etc." The court's minutes directed Rockroller

7

to submit a "judgment that has the verdicts copied verbatim within the text of the judgment."

Pullen then filed for bankruptcy, which stayed the proceedings as to him.[7] Rockroller submitted a third proposed judgment, which included prejudgment interest, incorporated the special verdicts, and again imposed joint and several liability on the Investment Group members for the full $335,000 in damages. Because of the stay, Rockroller omitted Pullen from the proposed judgment.

In a February 2012 hearing, the court stated Rockroller "is asking me to make substantive decisions, specifically to increase the damages for the individuals from [$50,000] to [$335,000] and [for] pre-judgment interest. [Rockroller] has indicated that the pre-judgment interest is automatic, and I'm not sure about that."
The court found Rockroller had made a "request" for prejudgment interest, and it agreed "the amounts are [liquidated]."

The Investors Group conceded the damages were liquidated. It argued, however, that because prejudgment interest is an element of damage, not a cost, Rockroller "was required to include that in the verdict for the jury to find," and since it did not do so the court could not add interest to the judgment. The court continued the matter.

At a May 2012 hearing, the court noted relief from stay was granted in Pullen's bankruptcy, and thus it could sign a judgment as to all defendants. Rockroller argued the

---

7    We deny Rockroller's request that we take notice of an order issued in the bankruptcy action, as it is unnecessary to our analysis of the issues on appeal.

judgment should include prejudgment interest, and the court agreed the damages were liquidated. Rockroller also argued the judgment should impose joint and several liability because the jury determined all defendants were guilty of conspiracy. The Investment Group members disagreed, arguing the verdict indicated the jury found Pullen conspired with all of the Investment Group members, but they each conspired separately with Pullen for the return of his $50,000 investment, and "this is most appropriately decided in a new trial of a JNOV [judgment notwithstanding the verdict] motion where the Court can look at the record evidence."

The court believed it could not sign a judgment that differed in any aspect from the jury verdicts. It determined Rockroller must address the issues of joint and several liability and prejudgment interest in a formal motion addressing the evidence and applicable law.

Judgment was finally entered on June 1, 2012, and it ordered Pullen to pay Rockroller $335,000, and each of the Investor Group members to pay $50,000. The judgment included blank lines for the potential later addition of prejudgment interest and joint and several liability, but Rockroller never brought a motion on the issues.

## DISCUSSION

## I.

### *Private Security Exemption*

### A.

Under section 25110, "[i]t is unlawful for any person to offer or sell in this state any security in an issuer transaction . . . unless such sale has been qualified . . . or unless such security or transaction is exempted."  "[P]urchasers of securities that have not been qualified may sue for return of the consideration paid, less any income received, or for damages if the purchaser no longer owns the security."  (*Spielman v. Ex'pression Center for New Media* (2010) 191 Cal.App.4th 420, 432; § 25503.)

Section 25102 identifies transactions that are exempt from the provisions of section 25110.  The party claiming an exemption has the burden of proof on the issue.  (§ 25163.)  Rockroller, whose Series C offering was admittedly unqualified, claimed an exemption under subdivision (f) of section 25102, which exempts "[a]ny offer or sale of any security in a transaction . . . that meets each of the following criteria:  [¶]  (1)  Sales of the security are not made to more than 35 persons, including persons not in this state.  [¶]  (2)  All purchasers either have a preexisting personal or business relationship with the offeror or any of its partners, officers, directors or controlling persons, or managers . . ., or by reason of their business or financial experience . . . could be reasonably assumed to have the capacity to protect their own interests in connection with the transaction.  [¶]  (3) Each purchaser represents that the purchaser is purchasing for the purchaser's own

10

account . . . and not with a view to or for sale in connection with any distribution of the security.  [¶]  (4)  The offer and sale of the security is not accomplished by the publication of any advertisement."  "This is known as the 'private' security exemption." (*People ex rel. DuFauchard v. O'Neal* (2009) 179 Cal.App.4th 1494, 1501.)

## B.

## 1.

The Investor Group contends the court erred by allowing the jury to determine whether Rockroller satisfied the criteria of section 25102, subdivision (f), as the exemption issue was strictly one of law for the trial court's resolution.  It is well settled, however, that the issue is a factual one for the jury.  (See, e.g., *People v. Salas* (2006) 37 Cal.4th 967, 973-974; *People v. Simon* (1995) 9 Cal.4th 493, 500; *People v. Cuccia* (2002) 97 Cal.App.4th 785, 796; *People v. Graham* (1985) 163 Cal.App.3d 1159, 1170-1174.)  It is true that the court vacillated between finding the issue was one of law or of fact, but ultimately it instructed the jury with the elements of section 25102, subdivision (f).

To upset the jury's verdict, the Investor Group is required to successfully challenge the sufficiency of the evidence to support it.  " 'We view all of the evidence in the light most favorable to the judgment, drawing every reasonable inference and resolving every conflict to support the judgment.  [Citation.]  "Even in cases where the evidence is undisputed or uncontradicted, if two or more different inferences can reasonably be drawn from the evidence this court is without power to substitute its own inferences or

deductions for those of the trier of fact. . . ." ' [Citation.] 'The term "substantial evidence" means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value. [Citation.]' " (*David v. Hernandez* (2014) 226 Cal.App.4th 578, 585.)

"The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.) "Defendants raising a claim of insufficiency of the evidence assume a 'daunting burden.' " (*Whiteley v. Phillip Morris*, *Inc.* (2004) 117 Cal.App.4th 635, 678.)

The Investor Group does not discuss the sufficiency of the evidence standard of review in conjunction with the exemption issue. " 'Arguments should be tailored according to the applicable standard of review.' [Citation.] Failure to acknowledge the proper scope of review is a concession of a lack of merit." (*Sonic Mfg. Technologies*, *Inc. v. AAE Systems*, *Inc.* (2011) 196 Cal.App.4th 456, 465.)

Further, when the sufficiency of the evidence is at issue, it is the appellants' duty to "present and discuss all the evidence, both favorable and unfavorable, and show why it was insufficient." (*Mendoza v. City of West Covina* (2012) 206 Cal.App.4th 702, 713.) " 'Failure to set forth [all of] the material evidence on an issue waives a claim of insufficiency of the evidence.' " (*Clark v. Superior Court* (2011) 196 Cal.App.4th 37, 52.)

12

The Investor Group fails to cite any of the evidence supporting the verdict. For instance, Rockroller cites Adams's testimony that Series C had 12 investors, well below the threshold of 35 for the exemption under section 25102, subdivision (f). Adams also testified Rockroller did not advertise for Series C, another criteria for application of the exemption. Further, there was significant testimony that Investor Group members had preexisting relationships with Pullen, because they all lived in Del Mar, and they were sophisticated businessmen with investment experience in private and startup companies. The Investor Group members concede they "did have a preexisting relationship with Pullen."

We need go no further, because it was the Investor Group's duty to specify the evidence. "It is not our job to comb through the record in search of grounds to upset the [judgment]." (*Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 899.) The presentation in the Investor Group's briefing constitutes a waiver or forfeiture of the exemption issue.

2.

In fact, the Investor Group does not assert the evidence was insufficient to show the section 25102, subdivision (f), exemption was applicable to the Series C offering. Its only contention as to the state of the evidence is that it was insufficient to show the Series A, Series B, and Series C offerings, considered together, were exempt. The Investor Group submits that as a matter of law, all offerings by a private company over time are a single transaction for purposes of securities law. The Investor Group asserts that because

13

Rockroller did not prove, for instance, that all three series were not offered to more than 35 persons, it did not meet its burden.

The Investor Group, however, does not cite the record to show it raised this argument at the trial court. " As a general rule a party is not permitted to . . . raise new issues not presented in the trial court." (*B & P Developement Corp. v. City of Saratoga* (1986) 185 Cal.App.3d 949, 959.)

In any event, the Investor Group does not present a cogent argument on the issue, and thus this is not the appropriate time to address it. " 'Appellate briefs must provide argument and legal authority for the positions taken. "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." [Citation.] 'We are not bound to develop appellants' arguments for them.' " (*Cahill v. San Diego Gas & Elec. Co.* (2011) 194 Cal.App.4th 939, 956.) The Investor Group's lone assertion is that consideration of Series A, Series B, and Series C independently "would be contrary to the regulatory objective of the Corporate Securities act meant to create a balanced regulatory scheme 'to cope with problems of modern securities law in California.' " This is not persuasive.

3.

Additionally, the Investor Group complains that Rockroller's corporate attorney, Rachelle Cohen, was allowed to testify the Series C offering was exempt from securities requirements, but the court excluded the rebuttal testimony of the Investor Group's undesignated securities expert. The Investor Group cites Cohen's testimony that the

14

Series C offering was exempt under section 25102, subdivision (f). She clarified, however, that Series C was only exempt if Rockroller complied with the statutory criteria. She was asked, "[C]an you say categorically today whether or not Rockroller actually met the requirements to maintain an unregistered security in the way they promoted and collected money in this Series C investment?" She responded, "No, I don't think I could say that about any client cause I'm not involved in the securities selling."

Thus, no rebuttal testimony was needed on the issue from the Investor Group's expert. Further, there is no indication the expert knew anything about Rockroller's compliance, and thus the testimony would have been immaterial to the exemption issue. The court correctly determined the issue was a factual matter for the jury, not a matter for expert testimony.

" 'The trial court's determinations on the admissibility of expert evidence are subject to review under the deferential abuse of discretion standard. [Citation.] The erroneous admission of evidence requires reversal of a judgment only when it results in a "miscarriage of justice." [Citation.] The admission of improper evidence results in a miscarriage of justice only if " 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " ' " (*Burton v. Sanner* (2012) 207 Cal.App.4th 12, 22.) The Investor Group has not shown any abuse of discretion or prejudice.

## II.

*Conversion*

### A.

" ' "Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. . . ." [Citation.]' " (*Welco Electronics*, *Inc. v. Mora* (2014) 223 Cal.App.4th 202, 208.)

" ' "Conversion is a strict liability tort. The foundation of the action rests neither in the knowledge nor the intent of the defendant. Instead, the tort consists in the breach of an absolute duty; the act of conversion itself is tortious. Therefore, questions of the defendant's good faith, lack of knowledge, and motive are ordinarily immaterial. [Citations.]" [Citation.] The basis of a conversion action " 'rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results.' " ' " *Welco Electronics*, *Inc. v. Mora*, *supra*, 223 Cal.App.4th at p. 208.)

16

B.

The Investor Group challenges the sufficiency of the evidence to support the jury's finding that the threshold for closing the Series C investments was $500,000 rather than $1,000,000. It cites evidence its members dealt only with Pullen, and the testimony of the members and Pullen that they agreed to a $1,000,000 threshold.

The Investor Group asserts its evidence was uncontradicted, and thus the jury was bound by it. However, " '[u]ncontradicted testimony in appellant's favor does not necessarily conclusively establish the pertinent factual matter: The trier of fact is free to *reject* any witness' uncontradicted testimony; and the court of appeal will affirm so long as the rejection was not arbitrary.' [Citations.] The jury 'had the benefit of observing the demeanor of witnesses and [is] therefore in a better position than the appellate court to *assess credibility*.' [Citation.] In assessing . . . credibility, the jury may consider [appellants'] interest in the case." (*Goehring v. Chapman University* (2004) 121 Cal.App.4th 353, 368.)

The jury obviously rejected testimony of a $1,000,000 threshold, and the record does not indicate it acted arbitrarily. On June 22, 2006, Pullen sent Adams an e-mail, which stated: "I am getting serious flack from the Del Mar guys [Investor Group members]. . . about total investment dollars. We are nowhere close to the [$]500,000 we were supposed to [raise] to take their money." The e-mail undermines testimony that the agreed threshold was $1,000,000.

17

Further, in deposition Pullen confirmed the Investor Group was giving him "serious flack," but at trial he denied having *any* communication with the Investor Group before sending the e-mail. He said the "serious flack" comment was a deliberate misstatement to prompt Adams to return the Investor Group's money. The jury may have determined Pullen's e-mail and deposition testimony were accurate, and his trial testimony was false, and thus it could reject his testimony as a general matter. The jury was instructed: "[I]f you decide that a witness deliberately testified untruthfully about something important, you may choose not to believe anything that witness said."

The Investor Group members also ignore other evidence supporting the verdict. Pullen described LaFlamme as his best friend, and the evidence shows LaFlamme was privy to Pullen's dealings on Series C. For instance, on March 14, 2006, Pullen sent LaFlamme a letter on Rockroller letterhead, in which he stated: "With the need for capital in mind, [Adams], [Flood] and I [Pullen] began making presentations to potential investors to raise at least $500,000 and at the most $1,000,000 to use for marketing, merchandising, advertising and other specific company requirements." Pullen asked LaFlamme to "[p]lease review this final effort."

Rockroller's legal counsel also kept LaFlamme in the loop. In a March 15, 2006, e-mail to Pullen, Adams, and LaFlamme, attorney Robert Kehr stated: "I want all of you to know that Rachelle [Cohen] should have a complete redraft of the operating agreement to you this afternoon. It will arrive with a number of comments and questions from us that I hope you will take the time to consider carefully. There are several details that

18

need to be decided on in order to turn the concepts we discussed into reliable contract language. This redraft is only a draft, so please don't hesitate to ask any questions you might have and to suggest any corrections or improvements that you think might add to the accuracy or completeness of the document."

On April 3, 2006, Cohen sent Pullen drafts of an Amended and Restated Operating Agreement and a Subscription Agreement. The Subscription Agreement refers to the Operating Agreement, which states Rockroller's fundraising goal was between $500,000 and $1,000,000. A reasonable inference can be drawn Pullen likely provided Koljonen with the documents, because on April 27, Pullen forwarded Koljonen's comments on the Subscription Agreement to Cohen and asked for her guidance because he was preparing for a meeting "with these gentlemen tomorrow." Koljonen also indicated he intended to get input from Severino and Pancheri.

The Investor Group members were friends and acquaintances from Del Mar, and they had prior investment experience together. Indeed, Englert testified that customarily, the Investor Group relied on Koljonen to "vet[] the agreements." He explained, "We get legal documents. Someone has to go through them and say this is B.S. and this is legitimate, this is that, this is this, and you mark them up. That's vetting. That's because you don't have eight or nine guys doing the same thing 'cause you never get anything done, so he typically -- he and Vince [Severino] typically vet things for us.' "

Terrill McCabe testified that LaFlamme was present during a dinner meeting when Pullen told McCabe that Rockroller was "looking to raise between $500,000 and

19

$1,000,000." Pullen also provided McCabe with written material stating that goal. McCabe testified, "I think it was generally understood that [Rockroller] had to reach the $500,000 portion." Based on that understanding, on April 28, 2006, McCabe invested $100,000 in Series C. On the same date, April 28, Koljonen, Englert, Severino and Pancheri, each gave Pullen a check for $50,000.

On May 1, 2006, Pullen sent an e-mail to Adams and Cohen, which states: "I just received [$]200,000 from the [Investor Group,] however[,] the money came with a caveat, if we did not raise the whole million that we were selling 20% for did we then re-proportion the 20% based on what we did raise i.e. $825[,]000 which would put a 'unit' at $41,250 and also how long would the offering be open? Their very valid argument is that those that came in early have more risk then [*sic*] one that sits on the sidelines and waits to see how much we raise before they will get in. Additionally[,] if I am unable to convince [Adams] of the need for this money under these terms then we also miss out on another $150,000 in capital from other investors that have said they will get in if we pass the $500,000 mark. And last but not least I will need to give the $200,000 back by this Friday [May 5]. What are your thoughts?" Englert and Severino testified the e-mail accurately represented the condition the Investor Group sought to extract from Rockroller.

In a May 2, 2006 e-mail, Cohen advised Pullen that the Series C terms would not change, and if the Investor Group was opposed, it "should not make the investment." May 5 passed without any of the Investment Group members asking for a refund or

seeking to impose any other contingency. On May 19 and 24, respectively, Pullen and LaFlamme each deposited $50,000 with Rockroller. On May 24, LaFlamme and Pancheri attended a meeting with Pullen. LaFlamme was asked to be a director, and he said he would consider it.

"Although a finding . . . may not be based on mere speculation or conjecture, such finding may be predicated on reasonable inferences drawn from circumstantial evidence." (*Smith v. Lockheed Propulsion Co.* (1967) 247 Cal.App.2d 774, 780.) "Our obligation is to indulge every reasonable inference which would support the verdict rather than impeach it." (*Da Silva v. Pacific King*, *Inc.* (1987) 195 Cal.App.3d 1, 11, fn. 5.) " 'The fact that it is possible to draw some inference other than that drawn by the trier of fact is of no consequence.' " (*Bloxham v. Saldinger* (2014) 228 Cal.App.4th 729, 739.) "When a reviewing court applies the substantial evidence standard, it must review the whole record to determine whether it supports the judgment." (*Dreyer's Grand Ice Cream*, *Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 840.)

The evidence is not overwhelming, but considered as a whole it amply supports the verdict. The jury could reasonably find it unlikely that Pullen cut one deal with McCabe, for a $500,000 threshold, and another with the Investor Group members. Pullen's May 1, 2006 e-mail to Cohen belies the notion he and the Investment Group members agreed they were entitled to a refund unless Rockroller raised a minimum of $1,000,000. To the contrary, it refers to a $500,000 threshold and states that if less than $1,000,000 was raised they intended to close the deal, but sought a commensurate

21

adjustment in the price of a one percent interest in the company. On this record, we cannot upset the verdict.[8]

C.

The Investor Group members contend that if we affirm, we "should . . . order that [they] are therefore members of Rockroller, each entitled to their 1% share interest in exchange for their investments." Rockroller agreed on the record that when the Investor Group members pay the judgment, they "will become members again." The judgment, however, is silent on the issue.

Rockroller advises us that it "stands by its offer to do equity as found by the trial court," but "it believes that the mechanics of accomplishing equity should be left to the trial court," particularly since "[m]embership cannot be calculated until the judgment . . . is satisfied." We agree this is not the correct forum to address the matter, and any further proceedings must be pursued in the trial court.[9]

---

[8] The Investment Group members assert the May 1, 2006 e-mail "conditioned [their] investment on Rockroller raising the full $1 million for Series C investments and further required if that full amount was not raised, whether the shares for that investment would be reallocated." The e-mail, however, does not show their investments were conditioned "on Rockroller raising the full $1 million."

[9] Given our holding, we are not required to address Rockroller's contention that Pullen lacked actual or apparent authority to bind the company.

III.

*Civil Conspiracy/Joint and Several Liability*

In its appeal, Rockroller contends the court erred by not construing the special verdicts to impose joint and several liability on all Investor Group members for the entire $335,000 in damages for conversion, based on a conspiracy theory, and instead requiring a formal motion on the issue. This is a legal matter we review de novo.

"There is no separate tort of civil conspiracy and no action for conspiracy to commit a tort unless the underlying tort is committed and damage results therefrom. [Citation.] The significance of a conspiracy theory of liability is that each member may be held jointly liable as a tortfeasor, even though he or she may not have participated directly in the underlying tort." (*Prakashpalan v. Engstrom, Lipscomb and Lack* (2014) 223 Cal.App.4th 1105, 1136.) "The elements of a civil conspiracy are (1) the formation of a group of two or more persons who agreed to a common plan or design to commit a tortious act; (2) a wrongful act committed pursuant to the agreement; and (3) resulting damages." (*City of Industry v. City of Fillmore* (2011) 198 Cal.App.4th 191, 212.)

As to economic damages, the liability of joint tortfeasors "is joint and several, and damages cannot be apportioned among them. [Citation.] Hence, the jury should return one verdict in a single sum for the plaintiff . . . against all defendants found liable." (7 Witkin, Cal. Procedure (5th ed. 2008) Trial, § 356, p. 415), citing *Mixon v. Riverview Hospital* (1967) 254 Cal.App.2d 364, 375 (*Mixon*).)

23

The special verdict form for conspiracy, to which Rockroller agreed, essentially invited the jury to assess individual damage amounts against each defendant rather than a single sum. As an example, we quote the first four questions.

"If you find conversion, answer the following:

"1. Did W. CHARLES PULLEN conspire to wrongfully take money from Rockroller?

"Yes _____  No _____

"If you answer 'Yes' answer question 2. If you answer 'No,' answer question 3.

"2. What are Rockroller's damages?

"$ _____

"3. Did TOM PANCHERI conspire to wrongfully take money from Rockroller?

"Yes _____  No _____

"If you answer 'Yes,' answer question 4. If you answer 'No,' answer question 5.

"4. What are Rockroller's damages?

"$ _____"

The verdict form includes eight additional questions, two per remaining Investor Club member.

"Prior approval of the form of a verdict or a failure to object to the form of verdict submitted to a jury has often been held to be a waiver of any defect in the form." (*Mixon*, *supra*, 254 Cal.App.2d at p. 376.) The rule, however, is not inflexible or automatic. A

24

party may seek clarification of a special verdict after the jury is dismissed if it *brings a motion* for a new trial or other relief pertaining to damages. (See, e.g., *Singh v. Southland Stone*, *U.S.A.*, *Inc.* (2010) 186 Cal.App.4th 338, 358 [proper remedy for an inconsistent special verdict is a new trial]; *All-West Design*, *Inc. v. Boozer* (1986) 183 Cal.App.3d 1212, 1220; *Mixon*, *supra*, 254 Cal.App.2d at pp. 377, 380 [motion for new trial after jury apportioned damages among joint tortfeasors]; *Marshall v. Brown* (1983) 141 Cal.App.3d 408, 415 [same]; *Dauenhauer v. Sullivan* (1963) 215 Cal.App.2d 231, 233 [motion for entry of joint and several judgment]; 7 Witkin, Cal. Procedure (5th ed. 2008) Trial, § 356, pp. 415-416.)[10] "In the absence of a motion by one of the litigants, or a request by the clerk, the trial court is not called upon to construe the verdict. . . ." (*Phipps v. Superior Court* (1939) 32 Cal.App.2d 371, 375.)

In Rockroller's view, by requiring it to bring a motion to challenge the jury's apportionment of damages on the special verdict for conspiracy, the court merely caused delay and shirked its duty to interpret the verdict. Rockroller cites *Orthopedic Systems*, *Inc. v. Schlein* (2011) 202 Cal.App.4th 529 (*Orthopedic Systems*), which explains: "When no objection is made that a special verdict is ambiguous or incomplete before the jury is discharged, 'it falls to "the trial judge to interpret the verdict from its language

---

10    A party may bring a motion for a new trial based on "[e]xcessive or inadequate damages" or "[i]nsufficiency of the evidence to justify the verdict." (Code Civ. Proc., § 657, subds. 5, 6, 7.) "The party intending to move for a new trial shall file with the clerk and serve upon each adverse party a notice of his or her intention to move for a new trial, designating the grounds upon which the motion will be made and whether the same will be made upon affidavits of the minutes of the court, or both. . . ." (Code Civ. Proc., § 659, subd. (a).)

considered in connection with the pleadings, evidence and instructions." ' " (*Id.* at p. 542.)

Rockroller, however, ignores that in *Orthopedic Systems*, the plaintiff, who prevailed on breach of contract and misappropriation claims, *brought a partial motion for JNOV*, arguing the special verdict form led the jury to improperly exclude $1,220,000 in profits from the total damage award. (*Orthopedic Systems*, *supra*, 202 Cal.App.4th at pp. 540-542.) Rockroller's reliance on *Woodcock v. Fontana Scaffolding & Equipment Co.* (1968) 69 Cal.2d 452, is also misplaced because it pertains to a *motion* to correct a verdict based on excessive damages. (*Id.* at pp. 455-457.)

Rockroller merely presented the court with a proposed judgment imposing joint and several liability. Rockroller argued a motion was unnecessary because "[t]hat's a legal theory that's a function of law. It's not a fact-finding mission." On appeal, however, Rockroller acknowledges the issue is largely factual. Rockroller states the "conclusion that defendants had as a group converted the entire $335,000 is amply supported by a review of the entire record." It cites a significant amount of evidence, including the following testimony by Englert: "The group is not singular; the group is a plural bunch; in other words we do things collectively, and if we're getting cheated or not treated correctly, we collectively will correct the problem."

The Investment Group counters that since the jury was properly instructed on the elements of conspiracy, "it must be concluded that the jury, at very most, found that each Appellant somehow 'conspired' individually with Pullen to convert Rockroller's funds

26

when each Appellant accepted the return of their respective $50,000 investment deposit." The Investment Group cites testimony its members were shocked and surprised when Pullen returned their investments. During trial, the court characterized the conspiracy evidence as "very, very thin."

We conclude the court did not err. The evidence should have been presented to the trial court in the first instance in a proper motion. The court had the inherent power to control the proceedings (*Nazir v. United Airlines*, *Inc.* (2009) 178 Cal.App.4th 243, 289-290), and it was not required to accept Rockroller's argument on the joint and several issue without reviewing the evidence and other pertinent information and giving the Investors Group the opportunity to formally respond. Further, a proper motion was required to make a record for appeal.[11]

## IV.

### *Prejudgment Interest*

### A.

We agree with Rockroller, however, that the court erred by not including prejudgment interest in the judgment absent a formal motion. We review the issue

---

[11] Rockroller asserts that before advising that a motion was required, the court had already "made the needed interpretation." Rockroller cites a comment in the court's order denying affirmative defenses, that "[t]his case was tried to a jury and the jury made certain findings regarding the affirmative defenses as well as a verdict finding that the Defendants had, as a group, converted $335,000." The special verdict on conspiracy, however, does not state that, and the court was not bound by the comment.

independently for legal error.  (*Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.* (2008) 169 Cal.App.4th 340, 347.)

"A person who is entitled to recover damages [that are] certain, or capable of being made certain by calculation" is also entitled to recover prejudgment interest on that amount from the date that the right to recover arose.  (Civ. Code, § 3287, subd. (a).) "Under [Civil Code] section 3287, subdivision (a) the court has no discretion, but must award prejudgment interest upon request, from the first day there exists both a breach and a liquidated claim."  (*North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 828 (*North Oakland*).)

"Damages are certain or capable of being made certain by calculation, or ascertainable, for purposes of the statute if the defendant actually knows the amount of damages or could calculate that amount from information reasonably available to the defendant.  [Citation.]  In contrast, damages that must be determined by the trier of fact based on conflicting evidence are not ascertainable."  (*Collins v. City of Los Angeles* (2012) 205 Cal.App.4th 140, 151.)  Under subdivision (b) of Civil Code section 3287, the court has discretion to award prejudgment interest on unliquidated damages.

"[N]o statute or rule of court establishes a procedure for requesting an award of prejudgment interest, or a time limit therefor, in the superior court."  (*North Oakland*, *supra*, 65 Cal.App.4th at pp. 829-830.)  The parties cite *North Oakland*, which adopts a rule on the proper procedure and time limit "in circumstances where damages had been awarded but no interest was included in the verdict *and where neither court nor jury had*

*determined whether the damages were liquidated or unliquidated*." (*Id.* at p. 829, italics added.)

*North Oakland* states: "That a party is entitled to prejudgment interest does not make an award automatic (except in the case of postjudgment interest). A request for interest must be made in the trial court; it cannot be made for the first time on appeal. [Citations.] [¶] A general prayer in the complaint is adequate to support an award of prejudgment interest. 'No specific request for interest need be included in the complaint; a prayer seeking "such other and further relief as may be proper" is sufficient for the court to invoke its power to award prejudgment interest.' " (*North Oakland*, *supra*, 65 Cal.App.4th at p. 829.)

*North Oakland* rejected the notion prejudgment interest may be requested in a cost bill. The court reasoned that since prejudgment interest is an element of damages, rather than a cost, it "should be awarded in the judgment on the basis of a specific request therefore made *before* entry of judgment." (*North Oakland*, *supra*, 65 Cal.App.4th at p. 830.)[12] *North Oakland* held: "Pending the promulgation of a rule by the Judicial Council, which we think appropriate, requests for prejudgment interest under [Civil Code] section 3287 by a successful plaintiff must be made by way of motion prior to entry of judgment, or the request must be made in the form of a motion for new trial no later than the time allowed for filing such a motion." (*North Oakland*, *supra*, at p. 831.)

---

12 "There is an inherent distinction between an award of interest and an award of costs. 'If allowable, interest is an element of damages provided by statute.' " (*North Oakland*, *supra*, 65 Cal.App.4th at p. 830, fn. 4.)

29

Rockroller's first amended complaint prayed for "[l]egal interest," which was sufficient to invoke the court's authority to award prejudgment interest. Further, Rockroller repeatedly requested that prejudgment interest be included in the judgment, beginning during jury deliberations and continuing throughout proceedings on the form of the judgment. At a February 2012 hearing, the court found the damages were liquidated, and the Investor Group conceded the finding was correct. At a May 2012 hearing, Rockroller urged the court to include prejudgment interest in the judgment.

The Investor Group contends Rockroller cannot recover prejudgment interest because it did not bring a formal motion, as required by *North Oakland*, *supra*, 65 Cal.App.4th at p. 831. As *North Oakland* observes, however, the procedure it adopted applies when neither the jury nor the court has determined whether the damages were liquidated or unliquidated. (*Id.* at p. 829.) In that scenario, a motion is required to resolve a key factual issue on the defendant's knowledge. (See *SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462; *Wisper Corp. v. California Commerce Bank* (1996) 49 Cal.App.4th 948, 958.) Here, the Investment Group members could unquestionably ascertain the amount of damages.

Additionally, this case does not present the "extreme facts" presented in *North Oakland*, *supra*, 65 Cal.App.4th 824. (*Steiny & Co. v. California Elec. Supply Co.* (2000) 79 Cal.App.4th 285, 294.) In *North Oakland*, without any notice to the defendants, the plaintiffs submitted a cost bill that included $39,025.43 in interest. (*North Oakland*, *supra*, 65 Cal.App.4th at p. 827.) The defendants moved to set aside the

30

order awarding interest, and at the hearing the plaintiffs' counsel represented he had orally requested interest during a hearing on the defendants' motion to tax costs. The court ordered a transcript of the hearing, and it did not include any reference to interest. (*Id.* at pp. 827-828.)

The trial court set aside the order awarding prejudgment interest, and the appellate court affirmed. *North Oakland* explains: "[A]t virtually the last minute, [the] plaintiffs inserted an interest award in the order awarding costs which they presented to the court, in clear violation of [the defendants'] due process right to notice and an opportunity for hearing. [Citations.] Although this due process defect was cured by the subsequent action by the court in reconsidering its ruling following briefing and hearing on the matter, we may consider this egregious conduct together with the extreme lateness of plaintiffs' request for interest as warranting the denial of prejudgment interest." (*North Oakland*, *supra*, 65 Cal.App.4th at p. 831.) Here, the court determined *North Oakland* had "nothing to do with what's happened in this case" because "we're still . . . trying to get a judgment signed."

Under the particular facts here, we conclude a formal motion was not required and Rockroller's *request* was sufficient. Neither the Legislature nor the Judicial Council has prescribed a noticed motion procedure for recovery of prejudgment interest, and we decline to impose one when the damages are undisputedly liquidated. A noticed motion would not have added anything to the analysis, it would have been a mere formality. (See Civ. Code, § 3528 ["The law respects form less than substance"].) Rockroller was

31

entitled to prejudgment interest under Civil Code section 3287, subdivision (a), and the court's refusal to include it in the judgment absent a formal motion was error.[13]

B.

Rockroller contends we should modify the judgment to include prejudgment interest. Rockroller cites Code of Civil Procedure section 43, which states: "The Supreme Court, and the courts of appeal, may affirm, reverse, or modify any judgment or order appealed from, and may direct the proper judgment or order to be entered, or direct a new trial or further proceedings to be had." The Investor Group asserts we should remand the matter to the trial court "for a proper and equitable calculation of prejudgment interest that does not penalize [it] for the lengthy 10 month delay in the entry of the court's final [j]udgment resulting from either Pullen's interim bankruptcy filing, or Rockroller's persistent inability to submit a form of judgment which both conformed to the jury's verdict and was acceptable to the trial court."

We elect to reverse in part and remand the matter to the trial court for its calculation of prejudgment interest and entry of a new judgment to include interest. The Investor Group has not cited any supporting authority for an equitable reduction of prejudgment interest, but it may raise the issue on remand.

---

[13]    It appears Rockroller is also entitled to prejudgment interest under Civil Code section 3336, which pertains specifically to conversion claims.

32

DISPOSITION

The judgment is reversed insofar as it does not award Rockroller prejudgment interest. The matter is remanded for further proceedings on that issue. In all other respects, the judgment is affirmed.

_____
McCONNELL, P. J.

WE CONCUR:


_____
AARON, J.


_____
IRION, J.